DIXIE DAIRIES CORPORATION, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3538–75, 3539–75, 10803–75,     Filed May 29, 1980.
1588–76, 1589–76.

*Walter L. Mims* and *Benton Burroughs, Jr.*, for the petitioners in docket Nos. 3538–75, 3539–75, 1588–76, and 1589–76.

*Thomas N. Carruthers, Jr., Lee C. Bradley, Jr., Gary E. Merringer,* and *Robert C. Walthall,* for the petitioner in docket No. 10803–75.

*John B. Harper,* for the respondent.

DRENNEN, *Judge:* In these consolidated cases, respondent determined the following deficiencies in, and additions to, petitioners' Federal corporate income taxes:

| Docket No. | Petitioner | Taxable year ending | Deficiency | Addition to tax under sec. 6653(a)[2] |
|---|---|---|---|---|
| 3538–75 | Dixie Dairies Corp | Feb. 29, 1972 | $59,075.40 | $2,953.77 |
| | | Feb. 28, 1973 | 56,931.26 | 2,846.56 |
| 3539–75 | Dairy Fresh Corp | Feb. 29, 1972 | 13,290.09 | 803.05 |
| | | Feb. 28, 1973 | 66,795.41 | 3,339.77 |
| 10803–75 | Pure Milk Co | Dec. 31, 1970 | 32,834.65 | --- |
| | | Dec. 31, 1971 | 148,140.95 | --- |

---

[1]Cases of the following petitioners are consolidated herewith: Dairy Fresh Corp., docket No. 3539–75; Pure Milk Co., a.k.a. Barber Pure Milk Co., docket No. 10803–75; Consolidated Dairies Cos., Inc., docket No. 1588–76; and Associated Grocers of Alabama, Inc., docket No. 1589–76.

[2]All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue, unless otherwise indicated.

| | | | | |
|---|---|---|---|---|
| 1588–76 | Consolidated Dairies Co., Inc | Mar. 28, 1970[3] | $25.00 | --- |
| | | Apr. 3, 1971 | 5,982.71 | $299.14 |
| | | Apr. 1, 1972 | 185,744.79 | 9,287.24 |
| 1589–76 | Associated Grocers of Alabama, Inc | Apr. 1, 1967 | 1,796.51 | --- |
| | | Mar. 28, 1970 | 5,189.13 | 259.46 |
| | | Apr. 3, 1971 | 141,642.46 | 7,082.12 |

In addition, respondent made certain adjustments to the income and deductions of petitioner Associated Grocers of Alabama, Inc., for the taxable year ended April 1, 1972, which adjustments reduced the net operating loss for that year available to be carried back to earlier taxable years, including the carrybacks to the taxable years ended March 28, 1970, and April 3, 1971.

Due to concessions by the parties, including respondent's concession that the section 6653(a) additions to tax are not applicable to any of the petitioners, the issues for our decision are:

(1) (a) Whether certain payments made by each of the petitioners to its customers are to be excluded in determining gross income or are to be treated as deductions from gross income subject to the limitations of section 162(c)(2).

(b) Whether, if the payments are deductions from gross income, they are nondeductible because of section 162(c)(2) since they were in violation of an Alabama State law which was generally enforced.[4]

(2) Whether petitioner Associated Grocers of Alabama, Inc., is entitled to a business bad debt deduction under section 166 for the taxable year ended April 1, 1972, for advances made to Radio Broadcasting Co., a corporation in which Associated was a shareholder. Resolution of this issue depends entirely on whether the advances were loans or capital contributions.

## FINDINGS OF FACT

Some of the facts have been stipulated and they are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner Dixie Dairies Corp. (hereinafter Dixie Dairies) and

---

[3]It is not explained why these fiscal years ended on different dates.

[4]The parties have stipulated that if sec. 162(c)(2) is not applicable, the payments were made in the ordinary and necessary course of petitioners' businesses.

petitioner Dairy Fresh Corp. (hereinafter Dairy Fresh) are both corporations organized under the laws of the State of Alabama. At the time each corporation filed its petition herein, each had its principal office in Greensboro, Ala. Dixie Dairies and Dairy Fresh are related corporations (brother-sister) by reason of common ownership.

Both Dixie Dairies and Dairy Fresh were accrual basis taxpayers, and each filed Federal corporate income tax returns for their fiscal years ended February 29, 1972, and February 28, 1973.

During the above taxable years involved, both corporations were primarily engaged in the processing and sale, at wholesale, of fluid milk and related milk products. Each corporation's customers consisted, for the most part, of grocery stores, supermarkets, and other retailers of milk and milk products.

Both Dixie Dairies and Dairy Fresh are also related corporations to Blackbelt Creamery Co., Inc. (hereinafter Blackbelt) by reason of common ownership. Blackbelt is not in the business of buying or selling milk or milk products.

During the taxable years in issue, Dixie Dairies and Dairy Fresh deducted the following amounts, inter alia, for sales supplies on their corporate income tax returns: [5]

|  | FYE Feb. 29, 1972 | FYE Feb. 28, 1973 |
| --- | --- | --- |
| Dixie Dairies ....... | $124,209.41 | $121,171.14 |
| Dairy Fresh ........ | 27,687.67 | 154,977.23 |

These payments were made to Blackbelt pursuant to invoices sent by Blackbelt to each of the corporations. Both Dixie Dairies and Dairy Fresh accounted for the payments on their books by debiting sales supplies and by crediting cash. The payments to Blackbelt were not for actual sales supplies but were to reimburse Blackbelt for payments (hereinafter cash rebates or rebates) it had made to retail customers of Dixie Dairies and

---

[5]The parties stipulated that Dixie Dairies deducted the noted amounts as "sales supplies." On its income tax returns for the 2 taxable years in issue, however, Dixie Dairies apparently deducted a portion of the payments in each year as "plant supplies." Because resolution of this case in no respect depends on the label attached to the deduction by Dixie Dairies, we have accepted the parties' stipulation.

Dairy Fresh in accordance with agreements that the two corporations had made with the retailers.[6]

Petitioner Pure Milk Co. (a.k.a. Barber Pure Milk Co.) (hereinafter Pure Milk) is a corporation organized under the laws of the State of Alabama. Pure Milk was one of a number of companies in the milk industry owned by George W. Barber or, following his death on February 15, 1970, by his estate. Pure Milk had its principal office in Birmingham, Ala.

Pure Milk was an accrual basis taxpayer, and it filed its Federal corporate income tax returns on a calendar year basis. Corporate income tax returns were filed for the years ended December 31, 1970, and December 31, 1971, the taxable years in issue.

Pure Milk was primarily engaged in the processing and sale at wholesale of fluid milk and milk products. Pure Milk's customers consisted, for the most part, of grocery stores, supermarkets, and other retailers of milk and milk products.

In 1970 and 1971, Pure Milk made cash rebates to retailers in the amounts of $54,137.81 and $282,082, respectively. For Federal income tax purposes in 1970, Pure Milk treated the cash rebates as exclusions from gross receipts in order to arrive at its net sales/gross income. These rebates were made by checks drawn on a special bank account of Pure Milk.

For Federal income tax purposes in 1971, Pure Milk treated the cash rebates made in that year as a cost or expense in determining cost of goods sold. Of the $282,082 in total payments, $214,414.80 was paid or accrued prior to December 1, 1971. Of the total cash rebates in 1971, $114,029.93 thereof was paid by Pure Milk by checks drawn on the special bank account described in the preceding paragraph. The remaining amount, $168,467.31, was paid by the use of Barber Ice Cream Co., a wholly owned corporation of George W. Barber's estate. Barber Ice Cream Co. issued its checks to the retailers and, at the end of 1971, Pure Milk reimbursed Barber Ice Cream Co. for the payments made on Pure Milk's behalf.

Petitioner Consolidated Dairies Cos., Inc. (hereinafter Consolidated), and petitioner Associated Grocers of Alabama, Inc.

---

[6]The term "cash rebates" is used for purposes of clarity and convenience and is not intended to denote the legal character of the payments involved. The term "retailers" refers to customers of the petitioners who purchased milk products at wholesale and sold them at retail.

(hereinafter Associated), are both corporations organized under the laws of the State of Alabama. At the time each corporation filed its petition herein, each had its principal office in Birmingham, Ala.

Both Consolidated and Associated were accrual basis taxpayers, and each filed its Federal corporate income tax returns on the same fiscal year basis. The two principal taxable years in issue, for which each corporation filed returns, ended on April 3, 1971, and April 1, 1972, respectively.[7]

Associated is a cooperative association of several hundred retail supermarkets, almost all of which are located in Alabama. These retail supermarkets own and manage Associated. From its inception in 1928 until 1962, Associated operated as a wholesaler of dry goods. Since 1962, it has expanded its services to its member supermarkets by entering additional lines of business, all of which are related in some way to its principal business. These additional lines do business primarily with Associated's member supermarkets.

One of the additional businesses entered into by Associated subsequent to 1962 was the furnishing of milk and related milk products. On January 1, 1970, Associated organized Consolidated as a wholly owned subsidiary. Consolidated buys milk from dairy farms and packages, sells, and delivers it to member supermarkets of Associated and to other customers.[8]

During the taxable years in issue, Consolidated and Associated paid cash rebates to retailers. During those years, Associated paid cash rebates in the amounts of $212,038.04 and $3,519.53, respectively. Consolidated paid similar rebates during the same taxable years in the respective amounts of $12,256.62 and $391,282.23. Such rebates were charged on the books of Associated and Consolidated as follows:

---

[7]In the case of Consolidated, the deficiency asserted for the taxable year ended Mar. 28, 1970, is the automatic result of respondent's adjustments for the taxable year ended Apr. 1, 1972, which adjustments increased Consolidated's taxable income, thereby providing sufficient income against which to apply Consolidated's investment credit for that year without necessitating the carryback of any portion to the taxable year ended Mar. 28, 1970. In the case of Associated, it has conceded respondent's adjustments which resulted in a deficiency for the taxable year ended Apr. 1, 1967. Associated's taxable year ended Mar. 28, 1970, is at issue solely because of the reduction of the net operating loss carryback from the taxable year ended Apr. 1, 1972.

[8]It is unclear to what extent Associated continued in the milk business after the incorporation of Consolidated.

|  | *FYE Apr. 3, 1971* | *FYE Apr. 1, 1972* |
|---|---|---|
| *Associated* | | |
| Sales .......................... | $209,203.59 | --- |
| Other income: | | |
| (administrative fees) .... | 2,834.45 | $3,519.53 |
| Total ...................... | 212,038.04 | 3,519.53 |
| *Consolidated* | | |
| Sales .......................... | --- | 371,408.70 |
| Equipment rental.......... | 12,256.62 | 19,873.53 |
| Total ...................... | 12,256.62 | 391,282.23 |

In each of the taxable years, a different method was used to account for the rebates made to member supermarkets of Associated. A third method was used to account for rebates made to retailers who were not member supermarkets.

During the taxable year ended April 3, 1971, Consolidated would compute the amount to be paid to member supermarkets and so inform Associated. Associated would then issue a credit to the member supermarket on one of Associated's billing statements. The total amount of these credits, $209,203.59, was ultimately debited to the "Sales Account" of Associated, thereby reducing its gross income.

Rebates, totaling $371,408.70, made to member supermarkets during the taxable year ended April 1, 1972, were accounted for in a slightly different manner. Although Associated continued to issue the credits to the member supermarkets, Consolidated ultimately utilized the rebates to reduce its income. During that year, payments were both debited to Associated's "Sales Account" and entered as an account receivable from Consolidated. In turn, Consolidated debited its "Sales Adjustment Account" in the amount of $371,408.70 and credited notes payable to Associated, thereby reducing Consolidated's net sales for the year.

For rebates to be made to retailers who were not members of Associated, Consolidated would compute the amounts of the rebates and would request a check from Associated for the total amount each month. Associated would then prepare a check for the total amount and deliver it to Consolidated. Consolidated

would then exchange said check for cashier's checks for each rebate to be made and would distribute these cashier's checks.

When Associated received from Consolidated the request for a check, it would debit its administrative fees account and credit cash. Associated would then issue an invoice to Consolidated and bill Consolidated for the amount of the check, and it would debit accounts receivable—Consolidated Dairies and credit administrative fees for the amount of the check. When Consolidated received an invoice from Associated, it would pay the invoice, debiting its equipment-rental account and crediting cash. This procedure resulted in Consolidated's taking a deduction for the rebates. The payments charged to the equipment-rental account amounted to $12,256.62 in the taxable year ended April 3, 1971, and $19,873.53 in the taxable year ended April 1, 1972.

In a few instances, Associated failed to prepare invoices for cash rebates made to the nonmember retailers. Since the invoices were not prepared, Consolidated did not reimburse Associated for the rebates, and they remained as a debit in the administrative fees account of Associated. These amounts were claimed as a reduction of other income by Associated and totaled $2,834.45 and $3,519.53 in the taxable years ended April 3, 1971, and April 1, 1972, respectively.

The above-described cash rebates made by all of the petitioners were in response to retailers' demands on wholesalers (such as petitioners) due to the competitive nature of the market. The rebates were made in cash or by check, by or on behalf of the petitioners, to retailers of milk and milk products, on account of purchases by such retailers of milk and milk products from petitioners. The amounts of such rebates were determined and paid pursuant to oral agreements between each of the petitioners and its respective retailers. The rebates were based on, and approximated, a percentage of the dollar volume of the purchases made. The oral agreements were made prior to the time the retailers made the purchases of the milk and milk products that gave rise to the rebates involved. These agreements were made by the petitioners with the full knowledge and agreement of their officers, directors, and stockholders.

In Alabama, the fluid milk industry is a regulated industry,

supervised by the Alabama Dairy Commission (hereinafter Dairy Commission).[9] Each of the petitioners operated under licenses granted by the Dairy Commission. Blackbelt, the corporation through which Dixie Dairies and Dairy Fresh funneled the cash rebates, was not in the business of buying and selling milk products and thus was not subject to control by the Dairy Commission.

The Dairy Commission was given considerable power with which to regulate the fluid milk industry, including the power to adopt all necessary rules and orders. Ala. Code tit. 22, secs. 210, 211. Failure of a licensee to comply with said rules and orders could result in the revocation of a license or in the imposition of other fines or penalties. Ala. Code tit. 22, sec. 217.

Included within the powers of the Dairy Commission, which power they exercised, was the authority to set the prices to be paid: (1) By retailers to wholesalers for milk and milk products; (2) by wholesalers to farmers to purchase raw milk; and (3) by customers to retailers. The set prices were contained in pricing orders promulgated by the Dairy Commission.

In connection with the price to be paid by retailers to wholesalers, the Dairy Commission set both minimum and maximum prices. It was statutorily provided that the sale of milk at less than the set minimum price was unlawful, regardless of whether the minimum price was circumvented by the payment of a discount or rebate or by the wholesaler's providing free refrigeration equipment or free services to the retailer. Ala. Code tit. 22, sec. 223. Certain volume discounts from the set minimum price were authorized, however.

The cash rebates in issue were in excess of the allowable volume discounts. Petitioners were not alone in giving such rebates, the practice being widespread throughout the milk industry in Alabama during the years here involved.

---

[9] Prior to Aug. 25, 1971, the fluid milk industry was supervised by the Alabama Milk Control Board. Ala. Code tit. 22, secs. 204–231 (1940), as amended. Effective Aug. 25, 1971, the applicable statutory provisions were amended, and the name of the supervising agency was changed to the Alabama Dairy Commission. 1971 Ala. Acts No. 408, p. 1069. The statutory provisions were subsequently revised and codified as Ala. Code tit. 2, secs. 13–40, et seq. (1975). The applicable statutory provisions, however, remained constant throughout all the taxable years in issue. The citations to the Alabama Code are to the statutes in effect as of Aug. 25, 1971.

Between January 1, 1970, and March 1, 1974, the Dairy Commission—

(a) from time to time enforced, or attempted to enforce, the regulations that prohibited wholesalers from providing retailers with refrigeration equipment and dairy cases and the regulations that prohibited wholesalers from providing extra services to retailers other than those for which the retailers paid;

(b) from time to time enforced, or attempted to enforce, its regulations that set the prices required to be paid by wholesalers to farmers to purchase raw milk; and

(c) from time to time enforced, or attempted to enforce, the regulations that set the prices required to be paid by consumers to retailers to purchase milk for public consumption.

The Dairy Commission did not, however, conduct any formal proceedings or hold any hearings concerning the enforcement of the regulations that set the prices required to be paid by retailers to wholesalers for milk and milk products. Nor were any licenses revoked or fines or other sanctions imposed either with regard to the petitioners or to any other wholesaler.[10]

It was not until the mid-latter part of 1973 that the Dairy Commission actively began to deal with these rebates. On December 21, 1973, the Dairy Commission issued a notice to the milk industry to the effect that hearings were to be held on the question of cash rebates, and that beginning February 1, 1974, an enforcement program would commence to stop the payment of cash rebates. Prior to that time, at least some members of the

---

[10]Initially, the parties stipulated that between Jan. 1, 1970, and Mar. 1, 1974, the Dairy Commission:

"did not enforce or attempt to enforce the regulations that set the prices required to be paid for milk and milk products by retailers to wholesalers (such as petitioner), or that prohibited cash discounts by wholesalers to retailers. The parties make no stipulation as to whether the Commission knowingly and willfully refused to enforce such regulations; or whether the Commission, if it had knowledge of the violations, would have refused to enforce the regulations."

Subsequently, a dispute arose as to the meaning of the first sentence of the quoted matter. Respondent interpreted that sentence to mean that the Dairy Commission "did not enforce or attempt to enforce" the relevant regulation by the bringing of any "formal" proceeding. This, to respondent, did not mean that "informal" proceedings, such as investigations, were not conducted. Petitioners gave a broader reading to the language, interpreting the sentence to mean that the Dairy Commission made no efforts at all, either formal or informal, to enforce the regulation at issue.

At trial, the Court determined that justice required that the stipulation not be interpreted so as to foreclose one of the parties' theories. Accordingly, we have interpreted the language of the first sentence as solely referring to "formal" proceedings. In light of our conclusion on the first issue, this dispute becomes moot.

Dairy Commission and its staff had knowledge of the fact that cash rebates were being paid. Other than generally discussing the rebates at its meetings and issuing notices to the industry to adhere to the Dairy Commission's pricing orders, no action was taken.

In the case of each of the petitioners, respondent determined that section 162(c) precluded the cash rebates from being excluded in determining gross income or from being deducted from gross income.

## Advances by Associated

On occasion, Associated purchased businesses unrelated to its operation of a wholesale grocery business for investment purposes. Prior to March 15, 1971, Associated became aware that the stock of Radio Broadcasting Co. of Birmingham (hereinafter Radio Broadcasting), operator of radio station WAQY, was for sale. Associated determined that it could purchase the radio station and operate it at a profit. It believed that its approximately 200 member stores would use the station to advertise, and the station would have readymade advertising income.

The radio station had not been a financial success prior to March 15, 1971, having operated at a loss since its inception. As of January 31, 1971, Radio Broadcasting's balance sheet reflected the following:

| | |
|---|---:|
| Assets | $22,566.37 |
| Liabilities: | |
| Notes payable—First Western Banks | 3,347.40 |
| Notes payable—others | 94,574.62 |
| Accounts payable | 23,748.28 |
| Long-term notes—shareholders | 92,887.00 |
| Other liabilities | 10,955.99 |
| Total liabilities | 225,513.29 |
| Capital: | |
| Capital stock | 7,988.00 |
| Retained earnings | (210,934.92) |
| Total capital | (202,946.92) |
| Total liabilities and capital | 22,566.37 |

For the year ended January 31, 1971, Radio Broadcasting's profit and loss statement showed a net loss of $41,353.24. Associated utilized this information in making its decision to purchase one-third of the shares of stock in Radio Broadcasting.

On April 1, 1971, Associated did purchase said one-third interest, amounting to 1,997 shares of voting common stock, in Radio Broadcasting Co. Prior to the purchase, the voting common stock was owned as follows:

| | |
|---|---|
| Thomas W. Gloor | 1,997 shares |
| William D. Sellers, Jr | 1,997 shares |
| Douglas W. Layton | 1,997 shares |
| Tommy Charles | 1,997 shares |
| Total | 7,988 shares |

Essentially, Associated purchased the stock owned by Layton for $20,000, and Radio Broadcasting retired the stock owned by Charles. At the same time, the stock of both Gloor and Sellers was given to Exchange Security Bank as security for a $110,000 indebtedness owed the bank by Radio Broadcasting.[11] Gloor and Sellers were to endorse the notes payable to the Exchange Security Bank becoming primarily liable for the repayment of the indebtedness.

At the time it purchased the stock, Associated also acquired an option to purchase the stock of Gloor and Sellers at the end of 1 year. The option provided that Associated would make arrangements to relieve Gloor and Sellers of their obligation on the debt to the bank in return for the stock.

The agreements pursuant to which Associated purchased the stock provided that it was Associated's responsibility to see that the radio station was adequately capitalized. Following a statement concerning the radio station's financial condition and its need for additional financing, it was specifically provided that Associated would either lend funds, up to $20,000, to Radio Broadcasting for operating capital or make the necessary arrangements for such funds through recognized lending agencies.

After acquiring the stock, Associated alone managed and

---

[11]This liability does not specifically appear on Radio Broadcasting's balance sheet of Jan. 31, 1971.

operated the radio station until operations were ceased in 1972. During this time, the other two stockholders were informed of Associated's actions, but they did not participate in management.

Between March 15, 1971, and April 1, 1972, Associated advanced $86,500 to Radio Broadcasting. These advances, which were used primarily for operating expenses, were made in the following increments:

*1971*

| | |
|---|---:|
| Mar. 15 | $6,000 |
| Mar. 29 | 1,500 |
| Mar. 31 | 3,000 |
| Apr. 8 | 500 |
| Apr. 16 | 7,500 |
| Apr. 23 | 4,000 |
| Apr. 27 | 4,000 |
| May 11 | 2,500 |
| May 14 | 5,000 |
| May 31 | 2,000 |
| June 15 | 2,500 |
| June 30 | 3,000 |
| July 16 | 5,000 |
| July 21 | 500 |
| July 30 | 3,000 |
| Aug. 16 | 5,000 |
| Sept. 15 | 5,000 |
| Sept. 30 | 500 |
| Oct. 15 | 6,000 |
| Oct. 30 | 3,000 |
| Nov. 16 | 3,000 |
| Nov. 30 | 1,000 |
| Dec. 16 | 4,000 |
| Dec. 30 | 2,000 |
| *1972* | |
| Jan. 18 | 3,000 |
| Mar. 6 | 1,000 |
| Mar. 16 | 2,000 |
| Mar. 31 | 1,000 |
| Total | 86,500 |

The amounts were recorded on Associated's books as advances, and debits were made to accounts receivable—Radio Broadcast-

ing. The radio station made corresponding debits to its account payable—Associated. Associated also accrued interest on the advances,[12] which interest was included in taxable income.

In addition to the foregoing advances, Associated also made payments to third parties for Radio Broadcasting's expenses. These payments were also treated as advances to Radio Broadcasting.

When Associated made the advances to Radio Broadcasting, it was expected that the amounts would be repaid when Radio Broadcasting was financially able to do so. Collateral security was not pledged for the advances.

On January 18, 1972, Radio Broadcasting executed two promissory notes payable to Associated in the amounts of $82,500 and $16,853.83. These notes were demand notes, with interest payable at the legal rate. The note for $82,500 represented advances then outstanding. No explanation was provided for the $16,853.83 note.

On January 20, 1972, Associated notified Gloor and Sellers that it would not exercise its option to purchase the additional stock.

Associated was not able to operate the radio station profitably. As of March 31, 1972, Radio Broadcasting's balance sheet showed the following:

*Assets* ............................................... $20,890.49

*Liabilities:*
| | |
|---|---|
| Payables—Associated .............................. | 94,381.20 |
| Accrued interest—Associated .................... | 4,060.73 |
| Notes payable—banks............................ | 152,902.84 |
| Long-term notes—stockholders .................. | 54,087.00 |
| Accounts payable................................. | 19,818.96 |

---

[12]Associated accrued the following amounts of interest on its books:

| | | |
|---|---|---|
| Sept. | 1971................................................. | $1,012.95 |
| Oct. | 1971................................................. | 335.38 |
| Jan. | 1972................................................. | 868.64 |
| Feb. | 1972................................................. | 434.32 |
| Mar. | 1972................................................. | 1,409.44 |
| | | 4,060.73 |

Evidence was not introduced as to the interest rate.

| | |
|---|---:|
| Other liabilities | $4,744.07 |
| Total liabilities | 329,994.80 |
| *Capital:* | |
| Capital stock | 7,988.00 |
| Retained earnings | (317,092.31) |
| Total capital | (309,104.31) |
| Total liabilities and capital | 20,890.49 |

For the 6-month period ended March 31, 1972, Radio Broadcasting showed a net loss of $30,257.47. On or about April 1, 1972, Associated terminated the operation of the radio station. Associated was never repaid for the advances or paid any interest on the advances.

On its return for the taxable year ended April 1, 1972, Associated claimed a long-term capital loss of $20,000 for its stock in Radio Broadcasting and a bad debt loss for the advances, including direct payments to third parties, made to Radio Broadcasting.[13]

In the statutory notice of deficiency, respondent disallowed the bad debt deduction for the $86,500 advanced directly to Radio Broadcasting on the grounds that such advances represented contributions to capital.

OPINION

*Cash Rebates*

Each petitioner, pursuant to oral agreements between it and its retail customers entered into prior to the sale of the milk and milk products which generated the cash rebates in issue, paid cash rebates to those customers based on a percentage of the dollar volume of the purchases of the milk and milk products. The cash rebates were utilized as a means to circumvent the minimum prices set for such products by the Alabama Dairy Commission. The initial question to be decided is whether the cash rebates are to be excluded in determining gross income, as petitioners argue, or whether they are to be treated as deduc-

---

[13]The exact amount of the bad debt loss for all advances made to Radio Broadcasting was not established. A total of $133,640 was deducted on Associated's return for fiscal year ended Apr. 1, 1972, as bad debt losses with no breakdown of its composition.

tions from gross income subject to the limitations of section 162, as respondent argues. In the various statutory notices of deficiency, respondent determined that the cash rebates could neither be excluded in determining gross income nor be deducted from gross income.[14]

The proper treatment to be accorded similar payments made by sellers of milk and milk products to retailers has been previously decided by this Court. *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707 (1956); *Atzingen-Whitehouse Dairy, Inc. v. Commissioner*, 36 T.C. 173 (1961).[15] In each of these cases, the Court determined that the payments were to be excluded in determining gross income, in effect, concluding that the milk and milk products were sold for an agreed net price which equaled the set minimum price less the cash rebates. The rationale underlying the decisions reached in *Pittsburgh Milk Co.* and *Atzingen-Whitehouse Dairy, Inc.*, has recently been reconsidered and approved by this Court. *Max Sobel Wholesale Liquors v. Commissioner*, 69 T.C. 477 (1977) (Court reviewed), on appeal (9th Cir., June 14, 1978); *Haas Brothers, Inc. v. Commissioner*, 73 T.C. 1217 (1980).[16]

Respondent does not argue that the above-cited cases are factually distinguishable from the instant case, nor does he argue that the rationale of those decisions is inapplicable herein. Rather, he asserts that *Pittsburgh Milk Co.* and its progeny were incorrectly decided, and he urges us to reconsider and overrule those decisions.

Respondent's argument that the cash rebates are not to be excluded in determining gross income has two components. The first component is that Congress, by enacting section 162(c)(2) in its present form,[17] intended to prohibit taxpayers from benefit-

---

[14]Respondent does not argue that the manner in which the petitioners originally accounted for the cash rebates on their tax returns has any effect on whether the rebates can be excluded in determining gross income.

[15]See also *Harmony Dairy Co. v. Commissioner*, T.C. Memo. 1960–109; *Rosedale Dairy Co. v. Commissioner*, T.C. Memo. 1957–243.

[16]The limitation on the rationale of *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707 (1956), as contained in *Alex v. Commissioner*, 70 T.C. 322 (1978), on appeal (9th Cir., Aug. 25, 1978), is not applicable on the facts herein.

[17]Sec. 162(c)(2) provides:

(2) OTHER ILLEGAL PAYMENTS.—No deduction shall be allowed under subsection (a) for any payment (other than a payment described in paragraph (1)) made, directly or indirectly, to any person, if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment

ing from illegal payments such as these cash rebates. Sections 1.61–3(a) and 1.471–3(d), Income Tax Regs., were promulgated to prevent the congressional intent from being circumvented, by prohibiting an exclusion from income for any amount that would be nondeductible under section 162(c)(2).[18] Therefore, the cash rebates are not excludable since section 162(c)(2) would preclude their deduction. In essence, respondent's argument is that the expression of public policy in section 162(c)(2), and the Treasury regulations enacted in furtherance of that policy, are subsequent to, and overrule the holdings of, *Pittsburgh Milk Co.* and *Atzingen-Whitehouse Dairy, Inc.*

The second component of respondent's argument is that, regardless of sections 1.61–3(a) and 1.471–3(d), Income Tax Regs., the cash rebates are not excludable in determining gross income; rather, they are business expenses. Respondent contends that the agreements between petitioners and retailers were in contradiction of State law and unenforceable. Petitioners thus received the purchase price of the milk under claim of right with no obligation to pay the cash rebates. If petitioners did pay the cash rebates, such payments were unilateral and legally gratuitous acts and not part of the initial milk sales. They were, therefore, in substance, sales and promotional expenses governed by section 162. Thus, respondent argues that, contrary to this Court's holding in *Max Sobel*, there is no distinction "*between* a discount or rebate to which the customers became entitled at the time of sale *and* costs incurred in the form of illegal payments, or payments to the third parties, which were not made pursuant to agreement between the buyer and the seller." *Max Sobel Wholesale Liquors v. Commissioner, supra* at 482–483.

---

under any law of the United States, or under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business. For purposes of this paragraph, a kickback includes a payment in consideration of the referral of a client, patient, or customer. The burden of proof in respect of the issue, for purposes of this paragraph, as to whether a payment constitues an illegal bribe, illegal kickback, or other illegal payment shall be upon the Secretary or his delegate to the same extent he bears the burden of proof under section 7454 (concerning the burden of proof when the issue relates to fraud).

Sec. 162(c), as presently written, is the result of two legislative acts: Tax Reform Act of 1969, Pub. L. 91–172, sec. 902(b), 83 Stat. 710; and Revenue Act of 1971, Pub. L. 92–178, sec. 310(a), 85 Stat. 525.

[18] See also Rev. Rul. 77–244, 1977–2 C.B. 58.

Emphasis in original. See *Alex v. Commissioner*, 70 T.C. 322 (1978), on appeal (9th Cir., Aug. 4, 1978).

We find neither component of respondent's argument persuasive. The effect of the enactment of section 162(c)(2) in its present form and of sections 1.61–3(a) and 1.471–3(d), Income Tax Regs., on the rationale of *Pittsburgh Milk Co.* was addressed by this Court in *Max Sobel Wholesale Liquors v. Commissioner*, *supra* at 484–485. Therein, the Court held that if Congress had intended to overrule *Pittsburgh Milk Co.* by the enactment of section 162(c)(2), it would have been more specific in doing so. We agree with that assessment.[19]

The second component of respondent's argument is likewise unpersuasive. We are convinced, as was the case in *Pittsburgh Milk Co.*, that the price at which the petitioners sold milk to retailers was an agreed net price comprised of the minimum set price less cash rebate, and it is only such net price that is includable in gross income. The purchase of the milk and the payment of the purchase price thereon, and the payment of the cash rebates are part of a single transaction. See *Haas Brothers, Inc. v. Commissioner*, *supra* at note 3.

Accordingly, the proper treatment for the cash rebates in issue is to exclude them in determining gross income. Furthermore, having reached this conclusion, we need not address the issues raised with respect to section 162(c).[20]

### Advances by Associated

The second issue to be decided is whether advances made by Associated to Radio Broadcasting Co. were loans or capital contributions. Resolution of this issue will determine whether Associated can deduct the advances as a business bad debt or as a capital loss, there being no dispute as to the worthlessness of the advances or their business nature.

---

[19]The factual circumstance which gave rise to our dissent in *Max Sobel Wholesale Liquors v. Commissioner*, 69 T.C. 477, 486 (1977), is not present in the instant case. Although some of the petitioners herein included the cash rebates in cost of goods sold for tax purposes, the parties stipulated, and we have found, that the rebates were paid in cash or by check.

[20]Petitioners argued that the milk-pricing regulations were not a "law of a state" within the sphere of sec. 162(c)(2), and also, that if they were the law of a State, the law was not generally enforced. Petitioner Pure Milk Co. also raised several constitutional arguments which we need not consider.

Section 166(a) provides as a general rule that a deduction shall be allowed for any debt which becomes worthless within the taxable year. Only a "bona fide" debt can be deducted, however. "A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166." Sec. 1.166–1(c), Income Tax Regs.

Characterization of the advances as either loans or capital contributions is a question which must be answered by reference to all the evidence, with the burden on Associated to establish that the advances were loans. *Trans-Atlantic Co. v. Commissioner*, 469 F.2d 1189, 1191 (3d Cir. 1972), affg. a Memorandum Opinion of this Court; *Berkowitz v. United States*, 411 F.2d 818, 820 (5th Cir. 1969); Rule 142, Tax Court Rules of Practice and Procedure.

In resolving similar questions of debt versus equity, courts have identified and considered various factors. See, e.g., *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972) (13 factors); *A. R. Lantz Co. v. United States*, 424 F.2d 1330 (9th Cir. 1970) (11 factors); *Fin Hay Realty Co. v. United States*, 398 F.2d 694 (3d Cir. 1968) (16 factors);[21] *Georgia-Pacific Corp. v. Commissioner*, 63 T.C. 790 (1975) (13 factors). Among the factors which have been considered are: the names given to the certificates evidencing the indebtedness; presence or absence of a fixed maturity date; source of payments; right to enforce payments; participation in management as a result of the advances; status of the advances in relation to regular corporate creditors; intent of the parties; identity of interest between creditor and stockholder; "thinness" of capital structure in relation to debt; ability of corporation to obtain credit from outside sources; use to which advances were put; failure of debtor to repay; and risk involved in making advances.

The identified factors are not equally significant (*Estate of Mixon v. United States, supra* at 402), nor is any single factor determinative. *John Kelley Co. v. Commissioner*, 326 U.S. 521, 530 (1946). Moreover, due to the myriad factual circumstances

---

[21]See *Astleford v. Commissioner*, T.C. Memo. 1974–184, affd. per curiam 516 F.2d 1394 (8th Cir. 1975); *Diamond Bros. Co. v. Commissioner*, T.C. Memo. 1962–132, affd. 322 F.2d 725 (3d Cir. 1963).

under which debt-equity questions can arise, all of the factors are not relevant to each case. The "real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice." *Estate of Mixon v. United States, supra* at 403. "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." *Fin Hay Realty Co. v. United States, supra* at 697. As expressed by this Court, the ultimate question is "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" *Litton Business Systems, Inc. v. Commissioner*, 61 T.C. 367, 377 (1973).

Having considered the circumstances of Associated's advances to Radio Broadcasting in light of the factors set forth in the above-cited cases, we conclude that the advances were closer in nature to capital contributions than to loans. Whatever intention Associated may have had to create a bona fide debt, the economic situation which existed at the time Associated made the advances requires that they be characterized as capital contributions. Hereinafter, only the factors considered material to our decision will be discussed.

The factor which provides the most support for Associated's contention that the advances were in fact loans was that the advances had what can loosely be described as the formal indicia of loans. Associated recorded the advances on its books as accounts receivable, and Radio Broadcasting recorded them as accounts payable. In January 1972, Radio Broadcasting executed a demand promissory note payable to Associated for the amount of the advances outstanding.[22] In addition, Associated accrued

---

[22]Little indication of the character of the advances can be drawn from the execution of the promissory note. As respondent argues, the timing is suspect since, during the same time period, Associated decided not to exercise the option to purchase all of Radio Broadcasting's stock, thereby, arguably, evidencing an intent to abandon its "investment" in Radio Broadcasting. Up until the time the note was executed, Associated was in the position of either exercising its option to buy the rest of the stock, thereby becoming the only party with an equity interest in Radio Broadcasting, or deciding not to exercise its option to buy the stock but to take a note covering its advances, thus attempting to put itself in a priority position over the other stockholders with regard to the advances. Nonetheless, Associated's argument that it is

interest on the advances throughout the year on its books and included said interest in income. Interest was also payable on the promissory notes. Finally, the advances and interest were listed on Radio Broadcasting's balance sheet as liabilities.

The weight these facts provide in support of Associated's argument that the advances were intended to be, and were in fact, loans, must be tempered by a number of considerations.

First, "allegedly objective economic indicia of debt such as consistent bookkeeping and consistent financial reporting on balance sheets are * * * little more than additional declarations of intent, without any * * * objective economic indicia of debt." *Alterman Foods, Inc. v. United States*, 505 F.2d 873, 879 (5th Cir. 1974). While intent of the parties is perhaps the ultimate question (see *Estate of Mixon v. United States, supra* at 407), these bookkeeping entries can be given little weight unless supported by some other objective evidence showing the advances to be loans, especially considering Associated's day-to-day control of the radio station and its option to acquire all of the stock in Radio Broadcasting. Under such circumstances, "form does not necessarily correspond to the intrinsic economic nature of the transaction." *Fin Hay Realty Co. v. United States, supra.*

Secondly, although the promissory note was a demand note, clearly, Associated would not have demanded payment if it would have imperiled the financial condition of Radio Broadcasting. See *Tyler v. Tomlinson*, 414 F.2d 844, 849 (5th Cir. 1969). Nor was there any indication that Associated expected to be repaid within a specific period of time. Rather, Associated would be repaid when Radio Broadcasting could afford to do so. Repayments dependent upon the fortunes of the business are indicative of equity. *Estate of Mixon v. United States, supra.*

Thirdly, Radio Broadcasting never repaid any of the advances or any interest thereon. Nor does it appear that Associated ever made a demand for such payment.[23] While it is recognized that

---

consistent with ordinary business practices to execute the promissory note near the end of the taxable year is reasonable. Furthermore, considering the relationship of Associated and Radio Broadcasting and the frequency and dollar amounts of the individual advances, it is reasonable to expect that individual promissory notes would not be executed concurrently with each advance.

[23]The record is unclear as to what occurred after Associated terminated Radio Broadcasting's

the advances were made only during 1 year,[24] and Radio Broadcasting was in continual need of funds during that period, nonetheless, the absence of any repayments underscores the conclusion that the consistent reporting of the advances as loans, standing alone, sheds little light on the true character of the advances.

Finally, although Associated accrued interest on the advances and included it in income, it also appears (although we cannot be sure) that the unpaid interest was treated as another advance and ultimately included in the amount deducted as a bad debt, thereby creating a wash. Further, it appears that respondent did not disallow the bad debt deduction for the unpaid interest.

Another factor which superficially indicates that the advances were loans was the fact that they were not made in proportion to the stock ownership in Radio Broadcasting. This fact, however, must be balanced by the fact that Associated had the option to acquire all of the stock in Radio Broadcasting. Thus, the initial disproportionate aspect of the advances must be discounted because, ultimately, Associated could have become Radio Broadcasting's sole shareholder. Associated's avowed purpose in acquiring Radio Broadcasting was to make a profit which could only be done by risking its advances for a 100-percent equity position in the company.

In addition to the foregoing factors which indicate that the advances were not loans, there are others. Of principal importance are: the "thinness" of the capital structures in relation to debt; the risk involved in making the advances; and the availability of outside sources of funds. These factors focus on Radio Broadcasting's persistent need for cash to continue operations, and they clearly indicate that repayment of the advances and payment of interest thereon were subject to the fortunes of the corporate venture.

The interim balance sheet which was used by Associated when it explored the possibility of purchasing Radio Broadcasting's

---

operations on or about Apr. 1, 1972. No evidence was introduced that bankruptcy proceedings or some other type of reorganization were undertaken. The record hints that Radio Broadcasting continued in some form.

[24]While it appears that $10,500 of the advances totaling $86,500 may have been made prior to execution of the agreement between Associated and Radio Broadcasting, neither party argues that these advances should receive any treatment different than the rest, so we do not address the subject.

stock provided that Radio Broadcasting had assets of $22,566.37; total liabilities of $225,513.29, including long-term notes payable to shareholders of $92,887; capital stock of $7,988; and negative net worth of $202,946.92. The profit and loss statement prepared for that year showed a net loss of $41,353.24. In addition, Radio Broadcasting had been an unprofitable operation since its inception.

Considering only the advances made by Associated which are at issue herein, the ratio of debt to equity was greater than 10 to 1. Adding Radio Broadcasting's other liabilities to the equation makes the ratio even greater.

The inadequacy of Radio Broadcasting's capital structure and the need for additional capital are clear. The agreement under which Associated purchased the stock recognized the "thinness" of Radio Broadcasting's capital structure when it provided that Associated would "lend" money to Radio Broadcasting or make arrangements for a third party to do so.

Under these circumstances, the risks that Associated would not be repaid were substantial. While we recognize that repayment of advances, whether loans or capital contribution, depend in part on the financial success of the receiver of the advances, we believe that the risks involved with regard to these advances are similar to the risks of any equity investment. "[I]f the shareholder's advance is far more speculative than what an outsider would make, it is obviously a loan in name only." *Fin Hay Realty Co. v. United States, supra* at 697.

Furthermore, it is difficult to believe that an outside lender would have loaned money to Radio Broadcasting as Associated did. No evidence was introduced to indicate that outside sources of credit were available. The origin of the notes payable listed on Radio Broadcasting's balance sheet were not explained. Considering that, with the exception of the addition of the amounts payable to Associated, the total of the notes payable remained constant, we assume that obligations were incurred prior to the purchase by Associated of its stock interest. Thus, there is no evidence to indicate that outside sources of credit were available to Radio Broadcasting. Considering Radio Broadcasting's financial condition, we believe it unlikely that funds from outside sources could have been obtained.

The remaining factors either give no indication one way or the other about the character of the advances, or they point to a

conclusion that the advances were capital contributions. Such factors as participation in management flowing as a result of the advances, status of the contributions in relation to regular corporate creditors, and the extent to which the advances were used to acquire capital assets are of little value in the factual setting presented.

Other factors, such as the source of repayment being tied to the fortunes of the business, point to the advances being capital contributions.

In summary, after having considered the evidence in light of the factors generally utilized in resolving such questions, we conclude that the advances were capital contributions. This conclusion comports with the economic substance of the transaction. Associated bought and took over active management of Radio Broadcasting at a time when the radio station was in poor financial shape. The advances were clearly at the risk of the business and, as such, were not the required debt which arises from a valid and enforceable obligation to pay a fixed or determinable sum of money. Accordingly, Associated is not entitled to a bad debt deduction for the cash advances for which respondent denied the deduction.

*Decisions will be entered under Rule 155.*