ROBERT H. LAGOY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lagoy v. Commissioner
Docket No. 10991-90
United States Tax Court
T.C. Memo 1992-213; 1992 Tax Ct. Memo LEXIS 230; 63 T.C.M. (CCH) 2729; April 8, 1992, Filed *230 Decision will be entered under Rule 155. Robert H. Lagoy, pro se. Joseph F. Long, for respondent. JACOBS
JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal income taxes: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
Sec. 6661
1986
$ 14,092
$ 705
50% of the
$ 3,523
interest due on
$ 14,092
1987
6,129
306
50% of the
1,532
interest due on
$ 6,129
All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues for decision are: (1) Whether petitioner is entitled to claimed business bad debt deductions of $ 60,000 in 1986 and $ 40,000 in 1987, and (2) whether petitioner is liable for the additions to tax for negligence and substantial understatement of income tax. FINDINGS OF FACT We incorporate the stipulations of facts and attached exhibits. Petitioner resided in New Hartford, Connecticut, when he filed his petition. He is a certified public accountant. During *231 the years in issue, he received income both as an employee of the Great Northern Corporation and through his private accounting practice. The Great Northern Corporation (Great Northern) and Delmar Group, Inc. (Delmar) are brother-sister corporations; the stock of each is owned equally by Leroy Bailey (Bailey) and James Seale (Seale). Great Northern and Delmar are Connecticut corporations organized in 1984, having their principal offices in Farmington, Connecticut. Great Northern was in the business of selling building products, primarily doors and windows, in both the wholesale and retail markets. It also sold and installed kitchen cabinetry. Delmar was in the business of building and selling residential housing. In the fall of 1984, Bailey and Seale were informed that the owner of a successful New York company, Fixture Hardware, Incorporated (Fixture Hardware), desired to retire and sell his company for $ 1,400,000. At that time, Fixture Hardware was generating approximately $ 1 million a year in owner's salary and profits. It was anticipated that Great Northern would purchase 80 percent of the stock or assets of Fixture Hardware and Delmar would purchase the remaining 20 *232 percent. After Bailey and Seale experienced difficulties in obtaining financing for the contemplated acquisition, petitioner offered to borrow against his home and lend Great Northern and Delmar $ 100,000 in connection with the contemplated acquisition. Petitioner made this offer believing that if Great Northern and Delmar acquired Fixture Hardware, he would become Fixture Hardware's outside accountant and receive the $ 35,000 annual fees which Fixture Hardware had been paying to other accountants. Petitioner's offer was accepted; whereupon, he borrowed $ 100,000 from United Bank and Trust (United Bank) and on January 3, 1985, gave Bailey's attorney, Thomas Clark (Clark), two checks (each in the amount of $ 50,000) made payable to Clark. Clark then issued two of his own checks against the $ 100,000 received from petitioner: One check for $ 80,000 was made payable to Great Northern (the $ 80,000 debt), and the other for $ 20,000 was made payable to Delmar (the $ 20,000 debt). In exchange for his loan, petitioner received two demand notes, one from Great Northern in the principal amount of $ 80,000, and the other from Delmar in the principal amount of $ 20,000. Both notes were *233 unsecured, and both bore interest at the rate of 12 percent per year. Also in January 1985, petitioner began working 25 hours a week as an employee of Great Northern, rendering in-house accounting services to both Great Northern and Delmar. For petitioner's services, Great Northern paid him $ 28,000 per year, plus fringe benefits. Petitioner also received $ 12,000 annually as interest on the $ 80,000 and $ 20,000 debts. Subsequent to petitioner's making the $ 100,000 loan, the owner of Fixture Hardware decided to turn the business over to his son. Thus, the contemplated acquisition did not materialize, and petitioner was left in the position of being a lender to two newly formed and financially strapped corporations. By September 1986, Great Northern had a negative $ 1,161,466 net worth and by the end of 1986, the claims of its secured creditors exceeded the value of its assets by $ 564,688. On its 1986 corporate income tax return, Great Northern reported a negative taxable income of $ 1,531,685. Although he knew his request would be futile, petitioner nonetheless asked Bailey if the $ 80,000 debt could be repaid. On December 1, 1986, Bailey wrote petitioner that Great Northern *234 "was not in a position to pay the principal or interest on your $ 80,000 note." Great Northern employed petitioner until June 1987. It paid him $ 38,760 in 1985 and $ 39,520 in 1986. In 1987, Great Northern paid petitioner $ 12,200, as salary, not interest. After petitioner left Great Northern's employ in 1987, Seale took control over the corporation's operations and significantly reduced them. Seale retained only 2 of Great Northern's 30 employees, he moved the business to a new location, and he limited the corporation's operations to the installation of kitchen cabinets. However, he continued to operate the business under Great Northern's name in order to utilize its operating losses. Delmar terminated operations at the beginning of 1987 and sold its assets at the end of 1987. In 1988, both Bailey and Seale filed for personal bankruptcy. Bailey listed petitioner as a creditor on his own bankruptcy petition; however, petitioner did not consider Bailey personally liable on either the $ 80,000 debt or the $ 20,000 debt. Petitioner claimed business bad debt deductions of $ 60,000 in 1986 and $ 40,000 in 1987. Respondent disallowed these deductions. ULTIMATE FINDINGS OF FACT
*235 (1) The $ 80,000 and $ 20,000 which petitioner advanced to Great Northern and Delmar, respectively, constitute debts of said corporations, not contributions to capital. (2) The $ 80,000 and $ 20,000 debts were made in order to enhance petitioner's accounting business client base. (3) The $ 80,000 debt became wholly worthless in 1986; the $ 20,000 debt became wholly worthless in 1987. OPINION (1) The Advances Constituted Debts, Not Contributions to Capital
The first issue is whether the $ 100,000 which petitioner advanced to Great Northern and Delmar constituted debts or contributions to capital. Section 166(a) permits the deduction of worthless debts. Section 1.166-1(c), Income Tax Regs., provides that "A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. * * * A gift or contribution to capital shall not be considered a debt for purposes of section 166." Among the factors identified by this Court in characterizing advances as debts or as capital contributions are the following: the names given to the certificates evidencing the indebtedness; *236 presence or absence of a fixed maturity date; source of payments; right to enforce payments; participation in management as a result of the advances; status of the advances in relation to regular corporate creditors; intent of the parties; identity of interest between creditor and stockholder; "thinness" of capital structure in relation to debt; ability of corporation to obtain credit from outside sources; use to which advances were put; failure of debtor to repay; and risk involved in making advances. [Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).]
Not all these factors are relevant to each case, and no single factor is determinative. Id. at 493-494. The ultimate questions are whether there was "'a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship? '" Id. at 494 (quoting Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 377 (1973)). After weighing the factors, we conclude that petitioner's advances constituted debts, not contributions to capital. *237 Six of the aforementioned factors support our conclusion. First, with respect to the name given the document evidencing each advance, each document was entitled demand note. Second, with respect to participation in management, petitioner did not participate in the management of either Great Northern or Delmar as a result of his advances. Instead, he merely continued to provide accounting services to them. Third, with respect to the parties' intention, petitioner credibly testified that he intended the advances to be loans. Fourth, with respect to the identity of interest between creditor and stockholder, petitioner owned no stock in Great Northern or Delmar. Fifth, with respect to repayment, Great Northern paid petitioner $ 12,000 in interest as due under the notes both in 1985 and in 1986. Finally, with respect to the risk involved, at the time the advances were made, petitioner had a reasonable expectation of repayment of the $ 100,000. In this regard, petitioner credibly testified that the advances were made to enable Great Northern and Delmar to purchase Fixture Hardware and that the anticipated purchase price was reasonable considering Fixture Hardware's successful operations. *238 (2) The Debts Were Business Debts
The second issue is whether petitioner made the loans in connection with a trade or business, within the meaning of section 166(d)(2)(A). Although section 166(a) permits the deduction of a worthless debt, section 166(d)(1)(A) provides that section 166(a) does not apply to a nonbusiness debt. In determining the character of a debt, the United States Supreme Court stated that "the proper measure is that of dominant motivation, and that only significant motivation is not sufficient." United States v. Generes, 405 U.S. 93, 103 (1972). We conclude that petitioner's dominant motivation in making the loans was to increase his accounting income; hence, petitioner's advances were made in connection with his trade or business. Petitioner credibly testified that he made the loans to enable Great Northern and Delmar to buy Fixture Hardware so that he, in turn, could earn the $ 35,000 per year in accounting fees Fixture Hardware was currently paying to its outside accountants. In arguing that petitioner did not make the loans in connection with his accounting business, respondent emphasizes that there was no fixed agreement that *239 petitioner would earn Fixture Hardware's accounting fees once Fixture Hardware was acquired by Great Northern and Delmar. Respondent argues that petitioner did not in fact earn any additional money or acquire any additional clients as a result of the loans. Respondent asserts that petitioner actually earned less as Great Northern's employee than as an independent contractor because his billing rate decreased from $ 50 to $ 25 per hour. The focus of our inquiry is on petitioner's dominant motivation in making the loans, which, in our opinion, was to earn the $ 35,000 in accounting fees Fixture Hardware paid its outside accountants. We recognize that there was no fixed agreement that petitioner would earn Fixture Hardware's accounting fees, that ultimately Great Northern and Delmar were unable to acquire Fixture Hardware, and that petitioner became a Great Northern employee. However, these facts are relevant only to the credibility of petitioner's testimony concerning his dominant motivation. Respondnet argues that every loan made by an accountant, or other professional person, to his client does not necessarily qualify as a business debt. As a general principle, we agree. In *240 support of her argument, respondent cites the following three cases: Maloney v. Commissioner, 566 F.2d 1054, 1055 (6th Cir. 1977), affg. T.C. Memo. 1975-286; Hogue v. Commissioner, 459 F.2d 932, 939 (10th Cir. 1972), affg. T.C. Memo. 1971-75; and Gustin v. Commissioner, 412 F.2d 803, 804 (6th Cir. 1969), affg. T.C. Memo. 1968-42. We distinguish these cases. In all three cases, the taxpayers' dominant motivation in guaranteeing their clients' loans or in advancing money to their clients was to protect their investments in their clients, not to enhance their client base or to increase their fees. In Maloney, we found it significant that the taxpayer did not regularly require compensation from his clients when he guaranteed their loans. In distinction from Maloney, here, petitioner expected to earn $ 35,000 per year in Fixture Hardware's accounting fees as a result of his loans and he earned 12 percent per year in interest on his loans. In Hogue, 459 F.2d at 938, the Tenth Circuit Court of Appeals found significant the taxpayer's testimony that *241 his loans were necessary to conduct an orderly liquidation of his client. In distinction from Hogue, here, petitioner testified that his motive in making the loans was to earn additional accounting fees. In Gustin, we found it "inconceivable that the petitioners would risk about $ 70,000 each so that they could obtain the relatively small amounts of attorney's fees and insurance premiums which could have been expected from" their client. In distinction from Gustin, here, the $ 12,000 per year in interest and the $ 35,000 per year in Fixture Hardware's accounting fees were not small amounts relative to petitioner's loans totaling $ 100,000. (3) The Debts Were Owed by Great Northern and Delmar, Not by Bailey
Respondent argues that the loans were in substance loans to Bailey. Respondent notes that petitioner gave the $ 100,000 to Clark, Bailey's attorney, and that Bailey decided that $ 80,000 of the $ 100,000 would be paid to Great Northern and that the remaining $ 20,000 would be paid to Delmar. Next, respondent notes petitioner's inability to specify whether Great Northern and Delmar planned to buy Fixture Hardware's stock or its assets. Respondent also *242 notes that Bailey listed petitioner as a creditor on Bailey's own bankruptcy petition. Respondent concludes that the debts could not have become worthless before 1988, when Bailey filed for personal bankruptcy. We disagree. Great Northern and Delmar were listed as the makers of the notes, and the notes were signed by Bailey in his capacity as their president. In addition, Bailey wrote petitioner in December 1986 to inform him that Great Northern was not in a position to repay the $ 80,000 debt. Although unsure about whether Great Northern and Delmar planned to buy Fixture Hardware's stock or its assets, petitioner credibly testified that Great Northern was planning to buy 80 percent and Delmar 20 percent of Fixture Hardware. Finally, petitioner credibly testified that he did not hold Bailey personally liable on either the $ 80,000 debt or the $ 20,000 debt. (4) The Debts Became Worthless in 1986 and 1987
A debt becomes worthless "in the year in which identifiable events clearly mark the futility of any hope of further recovery thereon." Messer v. Commissioner, 57 T.C. 848, 861 (1972). Worthlessness must be shown by objective standards. Perry v. Commissioner, 22 T.C. 968, 973 (1954). *243 Petitioner bears the burden of proving that the debts became worthless in 1986 and 1987. Rule 142(a); Messer v. Commissioner, supra at 861. Four of the factors considered by this Court in determining worthlessness include: (1) The subordinated status of the debt; (2) a decline in the debtor's business; (3) the claims of prior creditors far in excess of the fair market value of all the assets available for payment; and (4) the debtor's refusal to pay. American Offshore, Inc. v. Commissioner, 97 T.C. 579, 594-595 (1991). All four factors support our finding that the $ 80,000 debt became wholly worthless in 1986. First, with respect to the subordinated status of the debt, the $ 80,000 debt was unsecured. Second, with respect to a decline in the debtor's business, by September 1986, Great Northern's net worth equaled negative $ 1,161,466. On its 1986 corporate income tax return, Great Northern reported a negative taxable income of $ 1,531,685. Third, with respect to claims of prior creditors, by the end of 1986, the claims of Great Northern's secured creditors exceeded the value of its assets by $ 564,688. Finally, with respect to *244 the debtor's refusal to pay, Bailey informed petitioner in 1986 that Great Northern could not pay petitioner the principal or interest on the $ 80,000 debt. [1]
Two of these factors also support our finding that the $ 20,000 debt became wholly worthless in 1987. First, with respect to the subordinated status of the debt, the $ 20,000 debt was also unsecured. Second, with respect to a decline in the debtor's business, Delmar had stopped operating at the beginning of 1987 and had sold its assets at the end of 1987. However, petitioner *245 did fail to prove that $ 20,000 of the $ 80,000 debt became worthless in 1987. During the trial, petitioner conceded that the $ 80,000 debt became wholly worthless in 1986: Q How did you arrive at the $ 60,000 number? A Well, incorrectly, really, in a sense that I just -- I took it -- I knew -- I didn't really -- I was involved in tax season, and I was very busy and preparing my own return, and I did it in the most expedient manner. I took -- I just took a lump $ 60,000, because I had -- that brought me down to zero taxable income, basically, or close to it, and then I just took the balance of it in 1987, and that was my logic at the time. It's probably wrong, but I didn't -- it's sort of like the shoemaker and his children's shoes. I didn't really want to go back and make all the calculations, and I just took that amount, and I took the rest of it in the following year, knowing that I -- you know, my -- the taxable income that I had generated had been of course, at the top brackets and -- and -- so that I felt that I was basically wiping out the taxable income in that year, yes. And I will -- I will admit that -- that was not really the proper way of doing it. I should *246 have put the whole thing and made any forward and back calculations and done the research and -- but I didn't, you know.
Based on petitioner's trial testimony, we conclude that petitioner erred in deducting $ 20,000 of the $ 80,000 debt in 1987, because the $ 80,000 debt became wholly worthless in 1986. He should have listed the $ 80,000 debt as a wholly worthless debt on his 1986 tax return and handled any resulting carryover pursuant to section 172. Petitioner argues in his brief that he deducted only 75 percent of the $ 80,000 debt in 1986 based on Great Northern's financial situation. We will not consider this argument, because petitioner's trial testimony does not support this argument. Perkins v. Commissioner, 40 T.C. 330, 340 (1963). Respondent highlights three aspects of the evidence in support of her argument that the debts did not become worthless until after 1987. First, petitioner continued to receive his wages from Great Northern until June 1987. Second, according to respondent, both Great Northern and Delmar operated until the end of 1987 or until early 1988. Third, respondent objects because Great Northern had taken out a secured loan *247 with United Bank and as of August 1988, United Bank was still attempting to collect said debt. We found credible petitioner's explanation of these three aspects of this evidence. First, with respect to petitioner's remaining continued employment by Great Northern, petitioner admitted that in 1987 Great Northern paid him $ 12,200, which consisted solely of salary, not of interest. We believe that petitioner continued in the employ of Great Northern primarily because the Internal Revenue Service looked to him as a person responsible for the payment of Great Northern's and Delmar's 1986 employment tax withholdings and that such continued employment gave him an opportunity to have Great Northern satisfy said withholding tax obligation. In this regard, petitioner testified: And again, I stayed on. In hindsight, I would have left. I thought about leaving in October of 1986, when things got so bad, because I knew actually my money was gone at that point. I wasn't accomplishing anything by staying there. But I did feel an obligation to, basically to IRS, to help get that trustee debt paid off and resolved, because that had always bothered me, you know. It was beyond my control, *248 but I did feel that I didn't want to leave and have that sort of hanging over me, because in my practice I would be dealing with the same people from time to time, and I wanted to avoid that stigma if I could. It didn't work out that way and it ended up worse. But that was my original intention.
Second, with respect to Great Northern's and Delmar's continued operation, petitioner explained that when he left the employ of Great Northern in June 1987, Seale significantly reduced its operations and operated under Great Northern's name only in order to carry forward Great Northern's substantial operating losses. Petitioner explained that Delmar stopped operating at the beginning of 1987 and that he believed that it sold its assets at the end of 1987. Third, with respect to United Bank's collection efforts in 1988 on its loan to Great Northern, petitioner explained that United Bank's loan was secured and his loan was not. In addition, a representative of United Bank wrote petitioner that United Bank's collection efforts in 1986 and 1987 had proved fruitless. (5) The Underpayment in 1987 Was Due to Negligence
Section 6653(a)(1)(A) imposes a 5-percent addition to tax if *249 any part of the underpayment of tax is due to negligence. Section 6653(a)(1)(B) imposes a separate addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. Section 6653(a)(3) provides that negligence "includes any failure to make a reasonable attempt to comply with the provisions of this title". Within the context of section 6653(a), negligence has been defined as the "'lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). Petitioner offered no evidence indicating that he made a reasonable attempt to comply with section 166 or that he did what a reasonable and ordinarily prudent person would have done under the circumstances. Petitioner conceded at trial that the $ 80,000 debt became wholly worthless in 1986, but that he chose to deduct only $ 60,000 of the $ 80,000 debt in order to reduce his taxable income in 1986 to zero. Petitioner also explained that he deducted the excess $ 20,000 in 1987 *250 because he did not want to "go back and do all the calculations," because he was busy, because it was tax season, and because it was expedient. Petitioner admitted at the end of the trial that "it looks like I've done a pretty sloppy job of -- of taking these losses." As a certified public accountant who prepared his own tax returns, petitioner should have known he was not complying with section 166. Moreover, according to his trial testimony, petitioner apparently knew he was not complying with section 166. Petitioner has the burden of proving that any underpayment of tax was not due to negligence. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). He failed to meet his burden. Accordingly, we sustain the resulting addition to tax for negligence. (6) The Understatement May Have Been Substantial
Section 6661 imposes an addition to tax if the taxpayer substantially understates his tax liability. Under section 6661(a), the amount of the tax equals 25 percent of the amount of any underpayment attributable to such understatement. Under section 6661(b)(1)(A), an understatement is substantial if the amount of the understatement for the taxable *251 year exceeds the greater of either 10 percent of the tax required to be shown on the return or $ 5,000. Section 6661(b)(2)(B) provides that the amount of the understatement is reduced if there is substantial authority for the tax treatment or if the relevant facts affecting the tax treatment are adequately disclosed. We conclude that in 1987 petitioner improperly deducted $ 20,000 of the $ 80,000 debt. In fact, as previously noted, petitioner conceded during the trial that the entire $ 80,000 debt became wholly worthless in 1986. Accordingly, no substantial authority existed to support petitioner's deducting $ 20,000 of the $ 80,000 debt in 1987. In addition, the relevant facts affecting the tax treatment of the $ 80,000 debt were not adequately disclosed. If the Rule 155 computation reveals that petitioner's understatement of his 1987 tax liability was substantial, we sustain the resulting section 6661 addition to tax. Decision will be entered under Rule 155. Footnotes
1. Because of our finding that the Great Northern debt became wholly worthless in 1986, we do not address respondent's argument that petitioner failed to charge off $ 60,000 of the $ 80,000 debt as worthless in 1986. Sec. 166(a)(2)↩ provides that the Secretary may allow the deduction of a partially worthless debt in an amount not in excess of the part charged off within the taxable year. The charge-off requirement applies only to a partially worthless debt, not to a wholly worthless debt.