ESTATE OF LONNIE M. DUNN, DECEASED, LONNIE M. DUNN, III AND MERRILEE DUNN, SUCCESSOR INDEPENDENT CO-EXECUTORS, AND MARY R. DUNN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Dunn v. Commissioner
Docket No. 8696-85
United States Tax Court
T.C. Memo 1990-401; 1990 Tax Ct. Memo LEXIS 418; 60 T.C.M. (CCH) 317; T.C.M. (RIA) 90401; July 30, 1990, Filed *418 Decision will be entered under Rule 155. Michael J. Christianson, for the petitioners. James M. Kamman and Mary Tseng, for the respondent. COHEN, Judge. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1977
$    15,813 $     791
--
--
1978
17,984  899
--
--
1979
206,445 10,322
--
--
1980
2,498,518 124,926
--
--
1981
112,614      -- $ 5,631
*
*419 Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the sole issue remaining for decision, which was raised in a Supplement to Petition, is whether petitioners are entitled to a business bad debt deduction in 1983 entitling them to a net operating loss carryback to 1980. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference. Lonnie M. Dunn (Dunn, now deceased) and Mary R. Dunn (hereafter the Dunns) resided in Chappel Hill, Texas, at the time they filed the petition in this case. Dunoco
The Lonnie Dunn Company (Dunoco) was incorporated August 6, 1979, and adopted a fiscal year ending October 31. During 1980 and 1981, Dunn was the sole shareholder of Dunoco. In *420 1982, Dunn held a 93-percent interest in Dunoco and John W. Ohanian (Ohanian), a certified public accountant, held a 7-percent interest. Dunoco's real estate activities primarily involved acquiring real property, obtaining land use and zoning approvals, and arranging commitments for construction financing, i.e., the "entitlement process." Once the entitlement process was complete, Dunoco usually would sell the property to a partnership that would handle the physical construction of the property. The partners in these partnerships typically would include Dunn as a general partner, a financial institution that would provide construction funds, and other individuals who would receive limited partnership interests in exchange for their expertise in various areas of real estate development. The Tempe Project
In May 1980, Dunoco entered into a real estate contract with Vanguard Investment Partners (Vanguard), an Arizona partnership, to purchase 19 acres of land in the City of Tempe, Arizona, for a total purchase price of $ 2,218,810. During the years in issue, the Tempe property was Dunoco's second largest asset. The real estate contract specified a $ 25,000 deposit into *421 an escrow account with an additional $ 618,400 payable at closing. Dunoco was required to execute a promissory note secured by a deed of trust on the property in favor of Vanguard for the remaining unpaid balance of $ 1,575,410, payable in four installments of principal plus interest. The escrow was to close on August 12, 1980. Dunoco lacked sufficient cash to acquire the Tempe property. Dunoco, however, could acquire the Tempe property by borrowing from Dunn or borrowing from a third party with Dunn's guarantee. In a letter dated August 1, 1980, Dunoco advised the Bank of Newport that at the closing the seller would release the street area and all other public areas on the Tempe property. After the February 1981 installment payment was made, the seller would release additional property required for the first phase of development. On August 11, 1980, Dunn, individually, borrowed $ 650,000 from the Bank of Newport. The closing on the Tempe property occurred in August 1980, at which time the sellers received the $ 25,000 deposit plus an additional $ 618,400 from the proceeds of Dunn's $ 650,000 loan. Development of the Tempe project was delayed due to problems obtaining *422 "entitlement" from the City of Tempe for zoning, streets, and utilities. Subsequently, interest rates rose significantly, and Dunoco was unable to get construction financing for the project. Dunoco's real estate contract with Vanguard provided for an installment of $ 393,852, plus interest, payable on March 1, 1981. Dunoco was unable to make this payment. On March 20, 1981, Dunn, individually, borrowed $ 550,000 from the Bank of Newport. On that same day, Dunn paid $ 504,131 to Vanguard, the first installment due under Dunoco's obligation in connection with the purchase of the Tempe property. On January 30, 1984, Dunoco transferred the Tempe property to the Dunns in consideration for their assumption of a $ 3.6 million loan from the Canadian Commercial Bank. The law firm of Porter & Clemens provided legal advice in connection with the transfer of the Tempe property from Dunoco to the Dunns. They recommended that the parties to the transfer ensure that petitioners did not receive a "bargain" because there were other stockholders of Dunoco whose interests had to be protected. Dunoco was in need of cash and had been attempting unsuccessfully to sell the Tempe property for *423 $ 3.6 million. Accordingly, the parties to the transfer believed that the Tempe property was worth less than the $ 3.6 million loan assumed by the Dunns. On February 9, 1984, Dunn, individually, received a $ 10,100,000 loan from Bell Savings and Loan Association for construction of the Tempe Technology Center. Of the total loan amount, $ 3.6 million was used to pay off the loan from the Canadian Commercial Bank. The remaining loan proceeds were to be dispersed in accordance with the construction loan agreement on the basis of percentage of completion of the Tempe Technology Center. The construction loan was to be repaid in full by a permanent loan from Bell Savings and Loan Association following completion of construction. The Colony Village Project
The Colony Village property, purchased by Dunoco in 1980, was a 156-acre tract of land located in San Bernardino, California. Dunoco intended to develop the property as a planned community. During the years in issue, the Colony Village property was Dunoco's largest asset. At the time Colony Village was acquired, Dunoco obtained a United States Department of Housing and Urban Development (HUD) Title X loan for approximately *424 $ 23 million. Dunoco intended to install the infrastructure for roads and utilities. The structures on the property were to be built either by commercial builders or by partnerships that would include Ohanian and Dunn. Under the provisions of the initial HUD Title X loan, the infrastructure had to be completed within 18 months. At that time, Dunoco would begin to make quarterly loan payments. These payments were to be made from the sale of tracts of land that would be "rolled out" of the project. By the end of 1983, Dunoco had installed the infrastructure on the Colony Village project. HUD demanded that legal title to Colony Village be held in a single-purpose corporation. To comply with HUD's demands, title to Colony Village was transferred to Dunn Delaware Corporation (Dunn Delaware). Dunn Delaware was wholly owned by Dunn and was formed exclusively to hold title to the Colony Village project. Due to rising interest rates and a slowing housing market, Dunn Delaware obtained HUD approval for a $ 3 million second mortgage in 1983. Subsequently, HUD entered into a "forbearance agreement" and reduced the loan balance. HUD eventually foreclosed on the Colony Village property. *425 Bank of Newport Loans
During the years in issue, Dunn obtained loans, including those described above, totaling $ 2,250,000 from the Bank of Newport as follows: Date
Amount
4/15/80
$ 325,000
8/11/80
650,000
3/20/81
550,000
7/15/81
250,000
7/24/81
300,000
10/12/81
175,000
The Bank of Newport placed no restrictions on Dunn as to how the proceeds of these loans could be used. At the time he received each of these loans, Dunn pledged his shares of Pacific Lighting Corporation common stock as security. By a promissory note dated April 15, 1980, Dunn, individually, borrowed $ 325,000 from the Bank of Newport. The $ 325,000 note was due on April 15, 1981, but the loan was renewed until January 25, 1982. At that time, Dunoco became the primary obligor on a $ 325,000 promissory note that replaced the note on which Dunn was the obligor. By a promissory note dated August 11, 1980, Dunn, individually, borrowed $ 650,000 from the Bank of Newport. As described above, this loan was the source of the initial payments for the Tempe property. The $ 650,000 note was due February 11, 1981, but the loan was renewed until January 25, 1982. At that time, *426 Dunoco became the primary obligor on a $ 650,000 promissory note that replaced the note on which Dunn was the obligor. By promissory notes dated March 20, July 15, July 24, and October 12, 1981, Dunn, individually, borrowed a total of $ 1,275,000 from the Bank of Newport. The due dates of these notes were extended until January 27, 1982. At that time, Dunoco became the primary obligor on a $ 1,275,000 note that replaced the notes on which Dunn was the obligor. On July 24, 1981, Dunn, individually, signed a "General Loan and Collateral Agreement" providing that he had delivered, and might from time to time in the future deliver, various kinds of property to the Bank of Newport for security of any and all obligations of any kind whatsoever. The agreement further provided that, upon default of any obligation, the Bank of Newport could realize upon any property that was security under the agreement. Also on July 24, 1981, Dunn, individually, executed Federal Reserve Form U-1 in connection with the $ 300,000 loan from the Bank of Newport. Form U-1 is required in connection with extensions of credit secured by stock. Although the specific stock was not identified on the form, the *427 stated purpose of the loan was to provide "working capital." In connection with the loans to Dunoco, Dunn executed a "General Continuing Guarantee" in favor of the Bank of Newport with respect to all indebtedness of Dunoco. The maximum guarantee by Dunn was not to exceed $ 3.6 million. The Bank of Newport did not pay out any cash on Dunoco's execution of the promissory notes in January 1982. On January 25, 1982, Dunn authorized Dunoco to pledge 45,000 shares of Pacific Lighting Corporation common stock as security for any or all present or future obligations of Dunoco to the Bank of Newport. On January 25, 1982, Dunoco executed a "General Loan and Collateral Agreement" in favor of the Bank of Newport and executed two Federal Reserve Forms U-1, pledging shares of Pacific Lighting Corporation common stock as collateral for the $ 325,000 and the $ 650,000 loans. On January 27, 1982, Dunn authorized Dunoco to pledge 104,000 shares of Pacific Lighting Corporation common stock to the Bank of Newport as security for any or all future obligations of Dunoco. On January 27, 1982, Dunoco signed a "General Loan and Collateral Agreement," as well as a Federal Reserve Form U-1, pledging *428 104,000 shares of Pacific Lighting Corporation common stock as security for the $ 1,275,000 loan. In January 1982, when Dunn granted Dunoco the power to pledge his shares of Pacific Lighting Corporation common stock, he also wrote a letter advising his broker, Merrill Lynch, of the stock pledge. On January 24, 1983, Dunoco executed a $ 975,000 promissory note in favor of the Bank of Newport. This note was a consolidation of the $ 325,000 and the $ 650,000 promissory notes executed by Dunoco on January 25, 1982. In August 1983, the Bank of Newport required Dunn to sell the pledged shares of Pacific Lighting Corporation common stock and use the proceeds to pay some of Dunoco's obligations. The Bank of Newport wanted the Dunoco loans paid off because the Federal Deposit Insurance Corporation intended to classify the notes as "nonperforming." From August through October 1983, the Bank of Newport received proceeds of $ 3,035,654.90 from the sale of Dunn's Pacific Lighting Corporation common stock. The Bank of Newport applied the entire proceeds for the benefit of Dunoco; none of the proceeds were returned to Dunn. Specifically, the proceeds were applied as follows: Item
Amount
$ 1,275,000 Dunoco note
$ 1,275,000.00
Accrued interest
67,654.42
$   975,000 Dunoco note
701,942.30
Accrued interest
43,184.37
Accrued interest on
other debt
135,841.31
Subtotal
$ 2,223,622.40
Loan fees
32,500.00
Deposits for Dunoco's
benefit
779,532.50
Total proceeds
$ 3,035,654.90
*429 The proceeds from the sale of Dunn's Pacific Lighting Corporation stock were insufficient to pay in full Dunoco's loans to the Bank of Newport. In October 1983, the Bank of Newport created a new promissory note obligating Dunoco in the amount of $ 404,106.83. That amount reflected the $ 273,057.70 unpaid balance of the $ 975,000 note plus accrued interest of $ 131,049.13. On July 31, 1984, the Bank of Newport created a new promissory note obligating Dunoco in the amount of $ 500,000. This promissory note was one of a series of extensions on the due date of a loan originally made in 1982. Dunoco's Financial Status
Peat, Marwick, Mitchell & Co. (Peat, Marwick) prepared consolidated financial statements for Dunoco for the fiscal years ended October 31, 1980, 1981, and 1982. Peat, Marwick's consolidated balance sheets for Dunoco as of October 31, 1981 and 1982, showed total assets, liabilities, and stockholders' equity as follows: 1982
1981
Total assets
$ 29,250,873 $ 19,691,205
Total liabilities
$ 31,766,205 $ 19,598,234
Total stockholders'
equity (deficit)
(  2,515,332)
92,971
Total liabilities and
stockholders' equity
$ 29,250,873 $ 19,691,205
*430 In the audit report addressed to Dunoco's board of directors dated February 18, 1983, Peat, Marwick noted that: As discussed in notes 5 (Related Party Transactions), 7 (Notes Payable) and 11 (Liquidity and Working Capital), the Company has entered into numerous transactions with its stockholders and affiliates. These transactions include the principal stockholder making loans to the Company, personally guaranteeing or securing with personal assets Company loans aggregating $ 12,014,071 and the Company advancing to the principal stockholder or a company owned by him funds totaling $ 815,387.
Footnote 2 of Peat, Marwick's audit report disclosed the cost of properties under development and held for sale, including the Tempe and the Colony Village projects, as follows: 1982
1981
Colony Village
$ 17,533,660
$ 11,265,657
Tempe Commerce Center
$  2,944,265
$  2,925,591
Footnote 5 of Peat, Marwick's audit report disclosed related party transactions as follows: At October 31, 1982, the Company had received advances of $ 1,058,826 from a company partially owned by the President and principal stockholder. The Company has notes *431 payable to the President and principal stockholder aggregating $ 100,000 and $ 1,500,000 at October 31, 1982 and 1982 (see Note 7). During the years ended October 31, 1982, and 1981, interest costs amounting to $ 120,197 and $ 327,366, respectively, were incurred on these notes. At October 31, 1982, the Company has a note payable to a minority Company stockholder for $ 700,000 (see note 7). During the year ended October 31, 1982, $ 37,000 of interest was accrued on this note.
Footnote 7 of Peat, Marwick's audit report disclosed that Dunn had personally guaranteed debts of Dunoco totaling $ 6,482,738 at October 31, 1981. By October 31, 1982, Dunn's personal guaranty of Dunoco's debts exceeded $ 11 million. In connection with Peat, Marwick's audit of Dunoco, on January 19, 1983, the Bank of Newport confirmed to Peat, Marwick that Dunoco was indebted to the bank for $ 2,850,000. That amount included, among other debts, the promissory notes for $ 1,275,000 and $ 975,000. Footnote 11 of Peat, Marwick's audit report disclosed Dunoco's liquidity and working capital status as follows: Management of the Company believes the Company has the ability to (1) refinance *432 or restructure its existing debt, (2) ultimately dispose of its properties under development and held for sale at amounts in excess of their book value, including costs to hold and sell the properties, and (3) obtain additional equity capital, if and when the Company must satisfy current working capital requirements. Subsequent to October 31, 1982, the Company obtained commitment letters from various lenders for additional debt financing (see note 12). This allows the Company to fund additional working capital needs and to extend the period of time other projects may be offered for sale. Management believes the sale of its projects are not operationally interdependent. In addition, the Company sold certain assets (see notes 2, 6 and 12) and reduced its overhead to minimize future administrative expenditures. The President and principal stockholder has loaned, has personally guaranteed, or has secured with personal assets Company loans aggregating $ 12,014,071 at October 31, 1982.
On Schedules L of its corporate tax returns for the fiscal years ended October 31, 1981 and 1982, Dunoco disclosed no loans from stockholders. Tax Return Disclosure
The Dunns retained *433 Mark Seiler (Seiler), a certified public accountant, to prepare their 1983 Federal income tax return. On a Schedule C attached to their 1983 return, the Dunns claimed a $ 2,112,607 deduction for a business bad debt. In connection with their 1983 return, the Dunns also filed an amended return for 1980 prepared by Seiler. On the amended return, the Dunns claimed a net operating loss carryback from 1983 as a result of the business bad debt loss. In a statement on the amended return, the Dunns disclosed that: "Net operating loss carryback from 1983 generated by business bad debt loss. See computation on page 2 of Form 1045 provided for informational purposes. ($ 1,337,488)." OPINION The Briefs
Before discussing the substance of this case, we must comment on a frequent problem with briefs filed in this Court. Rule 151(e) provides in part that "proposed findings of fact * * * shall consist of a concise statement of essential fact and not a recital of testimony." Yet briefs, including those filed in this case by counsel experienced in practicing in this Court, chronically propose findings of fact that begin "Witness X testified that * * *";"Witness X recalled * * *"; or *434 "According to Witness X * * *." The parties also propose detailed and repetitious findings of fact that are immaterial to the issues to be decided. We are forced to cull out and reorganize the relevant facts from descriptions of the evidence and from facts that have no bearing on the questions in controversy; we are not always completely successful. The parties to this and other cases are reminded that in most cases the material facts are those that occurred during the years in issue, not what occurred during the trial. Sometimes the timing and sequence of varying claims may be relevant, and the testimony and exhibits are appropriately discussed in the argument sections of the briefs and in this section of the opinion. Those matters are not, however, appropriate findings of fact. Our task will be made much easier, and counsel will have the pleasure of seeing their words in our opinions more frequently, if they abide by this rule. The Issues
Petitioners contend that Dunn became a creditor of Dunoco by subrogation when the Bank of Newport compelled him to fulfill his guarantee of Dunoco's loans. Alternatively, petitioners contend that Dunn made certain advances to *435 Dunoco in 1980 and 1981, that the advances were loans made in connection with Dunn's trade or business, and that the outstanding loans became wholly worthless in 1983. Petitioners argue that they are therefore entitled to carry back to 1980 a net operating loss resulting from the business debts that became worthless in 1983. Petitioners bear the burden of proof. Rule 142(a). Initially, respondent argues that no debtor-creditor relationship existed between Dunn and Dunoco. Respondent contends that Dunn was the primary obligor on the original Bank of Newport loans and that he remained the primary obligor despite the subsequent substitution of Dunoco as an additional obligor. Respondent points out that Dunn's shares of Pacific Lighting Corporation common stock were the sole security for the repayment of the loans, even after Dunoco was substituted as the obligor and Dunn was designated as the guarantor. Alternatively, respondent argues that any advances from Dunn to Dunoco constituted capital contributions not bona fide debts. Because the parties agree on the law applicable to the debt or equity issue, we will consider that question first. *436 Section 166(a) allows a deduction for debts that become worthless during the taxable year. Business bad debts may give rise to a net operating loss carryback under section 172. The amounts claimed by petitioners are deductible only if the unrepaid advances are shown to be loans and not capital contributions. Sec. 166; sec. 1.166-1(c), Income Tax Regs.
To determine whether advances to a corporation are loans or capital contributions we consider the particular facts of the case. Matter of Uneco, Inc. v. United States, 532 F.2d 1204, 1207 (8th Cir. 1976); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980). A variety of criteria have been identified for determining whether a shareholder's advance is debt or equity. See Hardman v. United States, 827 F.2d 1409, 1411-1412 (9th Cir. 1987); Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972); Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968); Segel v. Commissioner, 89 T.C. 816, 827 (1987); Dixie Dairies Corp. v. Commissioner, supra, *437 and cases there cited. In Anchor National Life v. Commissioneer, 93 T.C. 382, 400 (1989), this Court identified eleven factors that guide our resolution of the debt or equity issue: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; and (11) the ability of the corporation to obtain loans from outside lending institutions.
In Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493-494, we described the various factors and their purpose as follows: The identified factors are not equally significant, * * * nor is any single factor determinative. * * * Moreover, due to the myriad factual circumstances under which debt-equity questions can arise, all of the factors are not *438 relevant to each case. The "real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice." Estate of Mixon v. United States, supra at 403."The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." Fin Hay Realty Co. v. United States, supra at 697.As expressed by this Court, the ultimate question is "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 377 (1973).
We have considered the facts and circumstances of this case and conclude that petitioners have failed to meet their burden of proving that the advances by Dunn to Dunoco were loans. Petitioners concede that each Bank of Newport *439 loan originated with documentation indicating that Dunn, individually, was borrowing money. Petitioners argue, however, that "most, if not all" of the proceeds from the original loans were expended for Dunoco's purposes. Petitioners also argue that Dunn intended that the original loans would be Dunoco's obligations and point out that in January 1982 the situation was clarified when Dunoco executed promissory notes to the Bank of Newport and assumed Dunn's original obligations. Petitioners point to the loan documents reflecting Dunn's indebtedness to the Bank of Newport and the later documents reflecting Dunoco's indebtedness as evidence that the parties fulfilled all the formalities necessary to create a bona fide loan. Petitioners concede, however, that there is no documentary evidence of any loans between Dunn and Dunoco. Respondent argues, and we agree, that the resolution of the debt or equity issue must focus on the relationship between Dunn and Dunoco rather than the relationship between the Bank of Newport and Dunoco. Because Dunn was the sole or majority shareholder of Dunoco during the years in issue, we do not give particular weight to certain factors, such as whether *440 the purported lender participated in management or whether the parties observed the formalities usually expected in arm's-length transactions. These factors almost always weigh against a sole shareholder and are thus more relevant to cases involving multiple shareholders. See J. S. Biritz Construction Co. v. Commissioner, 387 F.2d 451, 457-458 (8th Cir. 1967), revg. a Memorandum Opinion of this Court. Other factors, however, that do contribute to our decision are the absence of fixed maturity dates and the absence of a right to enforce the payment of principal and interest on the advances from Dunn to Dunoco. In addition, respondent argues that repayment of the advances was dependent on the fortunes of the business. See Dixie Dairies Corp. v. Commissioner, 74 T.C. at 495.This is a logical inference from the record, and petitioners have not shown any other likely source of repayment. Another indicia of capital contribution is that a corporation was so thinly capitalized, as reflected by a high ratio of debt to equity, that the loans were needed for capital purposes. Hardman v. United States, 827 F.2d at 1414.At all relevant *441 times, Dunoco was thinly capitalized. The corporation was experiencing losses, and the stockholders' equity was actually a negative amount as of October 31, 1982. Finally, inability to obtain loans from outside lending institutions is an indication that advances are capital in nature. Hardman v. United States, supra; Matter of Uneco, Inc. v. United States, 532 F.2d at 1210; Gilbert v. Commissioner, 248 F.2d 399, 406 (2d Cir. 1957).Respondent argues that Dunoco could not obtain financing without the personal guarantee of its owner, Dunn. Respondent also argues that Dunoco could not obtain independent financing on "similar terms" to those on which Dunn advanced money. See Fin Hay Realty Co. v. United States, 398 F.2d at 697. The record in this case shows the problems Dunoco had in obtaining outside financing. Because Dunoco could not obtain outside financing for its real estate development projects, it relied on Dunn for the necessary funds. Petitioners concede that the bank would not have made loans to Dunoco without Dunn's personal guarantee. Petitioners argue that Dunoco incurred outside financing *442 from unrelated third parties during the years in issue. Specifically, petitioners point to the financing of the Tempe property by Vanguard and the HUD-guaranteed construction loan on the Colony Village project. Vanguard, however, merely agreed to sell the Tempe property to Dunoco on an installment basis while retaining a security interest in the property. Similarly, the HUD-guaranteed loan was secured by the Colony Village property. Neither of these loans supports petitioners' argument that Dunoco could have obtained any of the Bank of Newport loans from independent parties without Dunn's personal guarantee and his pledge of his personal assets as security. The intent of the parties to the advances, as indicated by the objective facts, also supports respondent's position. Petitioners rely heavily on Ohanian's subjective opinion that Dunn intended that the advances to Dunoco be loans. We are persuaded, however, that Dunn did not extend loans with a reasonable expectation of repayment, as indicated by the objective facts discussed above. For the foregoing reasons, we conclude that the advances by Dunn to Dunoco were placed at the "risk of the business" and were therefore capital *443 contributions. Petitioners have failed to prove that the advances from Dunn to Dunoco were loans; thus, they are not entitled to bad debt deductions with respect to the advances. Consequently, we need not decide whether the "debts" were business or nonbusiness or whether the "debts" became worthless in 1983. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155. Footnotes
*. 50 percent of the interest due on the entire deficiency.↩