T.C. Memo. 2000-19


UNITED STATES TAX COURT


KHALIL AND LANA K. HAMDAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8669-97.                    Filed January 18, 2000.


Khalil and Lana K. Hamdan, pro sese.

<u>Ric Hulshoff</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>:  Respondent determined an $88,376 deficiency in petitioners' 1989 Federal income tax and a $17,675 section 6662(a) accuracy-related penalty. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The deficiency is based on an adjustment to the income of petitioners' wholly owned S corporation and a corresponding increase in petitioners' distributive share of the S corporation's income. The adjustment stems from the disallowance of: (1) A deduction for a $300,000 "profit participation fee" purportedly paid in 1989 by the S corporation to petitioners' wholly owned C corporation; and (2) travel and automobile expenses claimed by the S corporation. (An S corporation's income is passed through to its shareholders; thus, the disallowance of deductions claimed by an S corporation results not only in an increase in the income of the S corporation but also in an increase in the shareholders' distributive shares of the S corporation's income.)

In their petition, petitioners contest the increase to their distributive share of the S corporation's 1989 income, as well as the imposition of the section 6662(a) accuracy-related penalty. By way of an amendment to their petition, petitioners assert entitlement to a business bad debt deduction in 1990, which, if petitioners are correct, can be carried back to 1989, the year at issue.

Accordingly, the issues for decision are: (1) The propriety of the $300,000 "profit participation fee" deduction claimed by petitioners' wholly owned S corporation; (2) the propriety of travel and automobile expense deductions claimed by petitioners' wholly owned S corporation; (3) whether petitioners' advances to

their C corporation are to be characterized as loans (as petitioners maintain) or capital contributions (as respondent maintains); and if the advances are to be characterized as loans, further inquiry must be made into (a) whether the loans were business or nonbusiness debts and (b) whether the loans became worthless in 1990; and (4) whether petitioners are liable for the section 6662(a) accuracy-related penalty.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

## Background

Petitioners, husband and wife, resided in San Juan Capistrano, California, at the time they filed their petition.

On September 25, 1990, petitioners filed their 1989 Federal income tax return. In February 1993, petitioners and respondent executed a Form 872-A, Special Consent to Extend the Time to Assess Tax, with respect to tax year 1989. In April 1994, they executed a Form 872-A with respect to tax year 1990.

## Petitioners' Corporations

During the year at issue, petitioners were the sole shareholders of two California corporations: Hamdan Project Development (HPD), formed on May 24, 1984, and HPD-Latigo Corp. (HPD-Latigo), formed on July 14, 1987. Khalil Hamdan (petitioner) was the president of both corporations.

For tax purposes: (1) HPD was a C corporation and reported its income employing the accrual method of accounting, and (2) HPD-Latigo was an S corporation and reported its income employing the cash method of accounting.

HPD-Latigo had no personnel on its payroll.

Limited Partnership

Malibu Cedars, Ltd. (Malibu Cedars), is a California limited partnership formed in 1987 to acquire foreclosed rental property located in the Latigo Beach area of Malibu, California, and to convert that property (consisting of 104 apartments) into condominiums (hereinafter the conversion is sometimes referred to as the project or the Malibu Cedars project). Partnership interests in Malibu Cedars were held as follows:

General Partners

HPD-Latigo                25-percent interest
Khodor I. Saab            25-percent interest

Limited Partner

Cambridge Financial, Inc.    50-percent interest

In connection with the project, in July 1987, Malibu Cedars entered into an Agreement for Services (Agreement) with Plaza-HPD, a joint venture composed of Plaza Development, Inc. (Plaza) and HPD. Plaza was owned 50 percent by Mr. Saab and 50 percent by Joseph Ghadir.

The Agreement obligated Plaza-HPD to: (1) Manage, operate, maintain, lease, and rent to others the project property until such

time as the units were sold as condominiums; (2) contract with licensed contractors, architects, consultants, and civil engineers to renovate, improve, or modify the project property for conversion and sale of the units as condominium units according to approved plans and permits; (3) engage the services of attorneys, consultants, management and maintenance companies, accountants, and others for purchase and management, as well as to obtain necessary permits and approvals for sale, of the units as condominiums; (4) enter into agreements with brokers to handle sales of condominium units; (5) contract with marketing companies to market the condominium units; (6) exercise general supervision regarding those individuals and companies referred to above; and (7) perform all other reasonably required tasks to ensure speedy sale of the project property as condominiums at the optimal price.

In exchange for these services, Malibu Cedars agreed to pay Plaza-HPD: (1) A profit participation fee of 40 percent of all cash proceeds from sales in excess of the total costs the partnership incurred; and (2) a $750,000 overhead fee over 3 years. The fees paid to Plaza-HPD were distributed: HPD--47.5 percent; Plaza--52.5 percent.

The following chart represents the organizational structure of the Malibu Cedars project:



By December 31, 1989, Malibu Cedars had sold 96 of the 104 available condominiums. In terms of square footage sold, this constituted 86,532 of the 92,621 square feet of available property for sale (or 93.4 percent of the square feet of property for sale). The Malibu Cedars project had gross sales in excess of $28 million.

By December 31, 1989, Malibu Cedars had paid $1,239,750 to HPD, and $1,370,250 to Plaza in exchange for services rendered pursuant to the Agreement. Moreover, as of December 31, 1989, the books of Malibu Cedars reflected fees payable to HPD of $411,982 and fees payable to Plaza of $455,349.

In calculating its costs of goods sold for tax year 1989, Mailbu Cedars included $600,000 as construction costs, which was based on an accounting entry (specifically, an adjusted journal entry) that allocated construction costs on square footage sold rather than on units sold. In a Notice of Final Partnership Administrative Adjustment (FPAA), dated December 20, 1994, issued to HPD-Latigo, as Malibu Cedars' tax matters partner, respondent disallowed for 1989: (1) The aforementioned $600,000, and (2) $867,331 of claimed developers' fees. (The issues raised in the FPAA were not raised in the statutory notice of deficiency upon which this case is based.) Respondent's determinations in the FPAA were contested in this Court, and subsequently conceded, by Malibu Cedars. On May 20, 1997, a closing agreement was entered into

between Malibu Cedars and the IRS reflecting this concession.[1] The closing agreement was signed on behalf of Malibu Cedars by "Khalil Hamdan, H.P.D. Latigo". On May 29, 1997, the Court entered a stipulated decision reflecting the concession.[2]

Profit Participation Fee

As of December 31, 1989, the records of HPD-Latigo reflected an accounting entry for a $300,000 account payable to HPD, and the records of HPD reflected a corresponding accounting entry for a $300,000 account receivable from HPD-Latigo; both of these accounting entries related to a "profit participation fee".

The purported reason for the $300,000 profit participation fee was to compensate HPD for services (legal, accounting, and consulting) rendered to HPD-Latigo, including services rendered prior to HPD-Latigo's incorporation. Petitioners perceived HPD-Latigo to be their "investment arm" and HPD as the "operating arm" for HPD-Latigo.

---

[1] The closing agreement provided that Malibu Cedars, Ltd., was not required to include in its 1992 income $432,600, representing developers' fees that had been accrued and deducted in 1989 but never paid.

[2] Petitioners request that we revisit the issues involved in that case. We decline to do so. See, e.g., Stanko v. Commissioner, T.C. Memo. 1996-530. The doctrine of res judicata precludes relitigation of the issues involved therein. Moreover, the items at issue herein are those of the partner, HPD-Latigo, not those of the partnership, Malibu Cedars. Consequently, we have no jurisdiction to redetermine any adjustment to Malibu Cedars' partnership return. See Sente Inv. Club Partnership v. Commissioner, 95 T.C. 243, 247 (1990).

Travel and Automobile Expenses

For 1989, HPD-Latigo deducted $8,249 as "travel expenses" to entertain several Saudi investors in Cambridge Financial, Inc., and their entourage, by taking them to Utah to see summer snow. Additionally, HPD-Latigo deducted $7,379 in automobile expenses incurred for the use by the Saudi investors of a limousine (owned by petitioners) and driver.

Funds Advanced to C Corporation

Over the years, petitioners made advances to HPD; these advances were made to salvage petitioners' investment in HPD. Several of these advances were reflected in the minutes of HPD board of directors' meetings, as follows: (1) On September 1, 1987, the directors ratified borrowings of $1,688,084.35 from petitioners that occurred between December 18, 1986, and September 1, 1987. Of this amount, HPD had repaid $395,926.18, and (2) on October 15, 1987, the directors approved borrowing of $310,000, at an unspecified date, from petitioners. With respect to this advance, HPD's vice president executed a note, dated October 15, 1987, for $300,000, payable in 36 months from the date thereof. No interest was stated.

HPD repaid only a portion of these advances. Apparently repayment was by an accounting entry (debit to "loan to stockholders") rather than the payment of cash. The balance sheets of HPD reflect the following balances in the "loan to stockholders" account:

| Date | Balance |
|------|---------|
| Jan. 1, 1989 | $5,596,306 |
| Dec. 31, 1989 | 6,088,816 |
| Dec. 31, 1990 | 4,938,755 |
| Dec. 31, 1991 | 7,810,284 |
| Dec. 31, 1992 | 7,240,802 |
| Dec. 31, 1993 | 7,173,905 |
| Dec. 31, 1994 | 6,873,007 |

Petitioners made a series of loans totaling $125,000 to Mr. Saab in 1989. On February 11, 1992, Mr. Saab filed a chapter 7 bankruptcy petition, and the loans he owed to petitioners were discharged.

Tax Returns

On its 1989 Form 1120, U.S. Corporation Income Tax Return, HPD reported a $16,972 loss.

On its 1989 Form 1120S, U.S. Income Tax Return for an S Corporation, HPD-Latigo reported $1,145,203 as its distributive share of partnership profits from Malibu Cedars. (HPD-Latigo had no other income.) HPD-Latigo claimed deductions of $610,823 on its 1989 return, as follows: $300,000 as a profit participation fee, $19,073 as travel expenses, and $291,750 as amortized capitalized costs.

On their 1989 Form 1040, U.S. Individual Income Tax Return, petitioners reported $430,914 as their distributive share of profits from HPD-Latigo. Petitioners did not report any interest income from HPD on either their 1989 or 1990 Federal income tax return. As of December 31, 1994, neither petitioners nor HPD treated any

amount of the funds petitioners advanced to HPD as worthless loans.

The Audit

In response to Internal Revenue Service inquiries regarding the $300,000 profit participation fee, petitioners' accountant explained in an August 10, 1992, letter, that the fee represented a charge for services HPD rendered to HPD-Latigo (beginning from HPD-Latigo's inception). With this letter, two undated interoffice memoranda discussing the $300,000 fee were enclosed.[3]

Notice of Deficiency

In the notice of deficiency, respondent increased petitioners' 1989 distributive share of profit arising from HPD-Latigo (based upon the disallowance of HPD-Latigo's $300,000 profit participation

---

[3]    Mr. Hamdan wrote a memorandum on HPD's behalf, advising Peter Klaiber, HPD's executive vice president, that HPD should charge HPD-Latigo an $100,000 yearly fee for services rendered. In a second memorandum, Mr. Klaiber advised Mr. Hamdan that an $100,000 yearly fee would be "reasonable", and would cover compensation for services HPD rendered regarding HPD-Latigo's formation. Mr. Klaiber listed the services to be rendered, among others, as follows:

> 01. A compensation towards the formation of the corporation:
>
>     Legal, Accounting and Tax Consultation; Federal and State Registration; Incorporation Certification; Notarization; Publication and other similar matters.
>
> 02. A compensation towards the running of the corporation:
>
>     Outside Legal, Accounting and Tax Service; Internal Maintenance of Accounting and Tax Records; General and Administrative Service; and other similar matters.

fee deduction for that year).  The notice of deficiency also disallowed petitioners' flow-through deductions of $8,249 in travel expenses and $7,379 in automobile expenses.[4]

OPINION

First, we must deal with petitioners' limitations argument. Petitioners assert that the notice of deficiency is invalid because respondent failed to secure an extension of time from petitioners' S corporation (HPD-Latigo) for 1989.

When deficiencies result pursuant to a taxpayer's status as a shareholder in an S corporation, it is the taxpayer's return, not that of the S corporation, that is determinative for section 6501(c)(4) purposes.  See Bufferd v. Commissioner, 506 U.S. 523, 533 (1993).  Petitioners and respondent entered into an agreement (Form 872-A) to extend the time to assess petitioners' 1989 taxes.  The notice of deficiency was issued prior to a termination of that agreement.  Accordingly, we reject petitioners' limitations argument.

Issue 1.  Profit Participation Fee

We now turn our attention to the propriety of the $300,000 profit participation fee deduction claimed by HPD-Latigo. Respondent disallowed this deduction on the basis that petitioners failed to establish "that the amount [was] incurred or, if incurred,

---

[4]    On HPD-Latigo's 1989 return, $19,073 was listed as travel.  The $19,073 comprised $8,249 in travel expenses, $7,379 in automobile expenses, and $3,445 for services rendered by an accounting firm.  Respondent allowed the $3,445 for accounting services.

paid by you during the taxable year for ordinary and necessary business purposes."

It is axiomatic that a taxpayer does not have an inherent right to take tax deductions. Deductions are a matter of legislative grace, and a taxpayer must show that the deduction sought comes within the express provisions of the statute. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Section 162(a) provides a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. A cash basis taxpayer is entitled to a deduction for such expenses in the year actually paid. See sec. 461(a); sec. 1.461-1(a)(1), Income Tax Regs. We look to whether a "hardheaded" businessperson, under the circumstances, would have incurred the expense. See, e.g., Cole v. Commissioner, 481 F.2d 872, 876 (2d Cir. 1973), affg. T.C. Memo. 1972-177.

At the outset, we are mindful that HPD-Latigo employed the cash method of accounting. The profit participation fee was not paid in cash, but rather through an accounting entry--an adjusted journal entry. Assuming arguendo that the fee was paid in 1989, we agree with respondent that the fee is not deductible because there has been no showing that the fee constituted an ordinary and necessary business expense.

First, there was no written agreement reflecting that HPD was to provide services to HPD-Latigo. The two undated memoranda petitioners introduced into evidence are suspect and not reliable.

Second, we are not satisfied that HPD performed services for HPD-Latigo. Hence, there is no perceptible business purpose or economic justification for the profit participation fee.

Third, by directing the S corporation (HPD-Latigo) to show an account payable of $300,000 to the C corporation (HPD), the profits of the S corporation decreased and were moved into the C corporation, which was running at a loss. We agree with respondent that the profit participation fee was but a fabrication, primarily, if not solely, engineered to shift income between related entities in order to minimize petitioners' (and their wholly owned entities') overall tax obligation. Consequently, we conclude respondent properly disallowed the claimed $300,000 profit participation fee, which in turn resulted in an increase in petitioners' 1989 distributive share of profits from HPD-Latigo.

Issue 2. Travel and Automobile Expenses

The next issue is whether HPD-Latigo is entitled to a $8,249 deduction for travel expenses and a $7,379 deduction for automobile expenses.

Section 162(a) allows a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business". A taxpayer must substantiate any deduction claimed. See Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976). In substantiating deductions, taxpayers are required to maintain adequate records sufficient to enable the Commissioner to determine the taxpayer's

correct tax liability.  See <u>Meneguzzo v. Commissioner</u>, 43 T.C. 824, 831-832 (1965).  Section 274(d) provides that no deduction or credit will be allowed for any traveling expense or for any activity that is of a type generally considered to constitute entertainment, amusement, or recreation "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement".

Petitioners failed to establish their entitlement to the travel and automobile expense deductions.  They failed to produce contemporaneous logs documenting the expenses; they produced only a few canceled checks and receipts that for the most part documented purchases of women's sportswear and travel in Europe.

In sum, petitioners have failed to satisfy the requirements of sections 162 and 274.  Accordingly, we sustain respondent's determination on this issue.

<u>Issue 3.  Loans vs. Capital Contributions</u>

The next issue is whether petitioners' advances to HPD are to be characterized as loans or capital contributions.  If we determine the advances to be loans, further inquiry must be made into whether the loans were business or nonbusiness debts and whether they became worthless.[5]  Respondent contends the advances were capital

---

[5]     Petitioners claim they are entitled to a bad debt deduction in 1990 with respect to funds they advanced to HPD. Petitioners assert that the bad debt deduction created a net operating loss, which they seek to carry back to 1989 under sec. 172.  We have jurisdiction over those items in years that bear on a taxpayers' tax liability for the year at issue.  See sec.
(continued...)

contributions.  Petitioners argue that they were loans and that they are entitled to a $357,557 bad debt deduction for 1990 (which can be carried back to 1989, the year at issue), calculated as follows:

| | |
|---|---:|
| HPD's negative retained earnings | ($1,357,557) |
| HPD's capital stock | 1,000,000 |
| 1990 bad debt | 357,557 |

Generally, taxpayers may deduct the value of bona fide debts owed to them that become worthless during the year.  See sec. 166(a).  Bona fide debts generally arise from valid debtor-creditor relationships reflecting enforceable and unconditional obligations to repay fixed sums of money.  See sec. 1.166-1(c), Income Tax Regs. For section 166 purposes, contributions to capital do not constitute bona fide debts.  See Kean v. Commissioner, 91 T.C. 575, 594 (1988). The burden of establishing that the advances were loans rather than capital contributions rests with the taxpayers.  See Rule 142(a).

Courts look to the following nonexclusive factors to evaluate the nature of transfers of funds to closely held corporations: (1) The names given to the documents evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of repayments; (4) the right to enforce repayment of principal and interest; (5) participation in management; (6) whether the taxpayers

---

[5](...continued)
6213(a); Rule 13(a); Calumet Ind. v. Commissioner, 95 T.C. 257, 274 (1990) (citing Lone Manor Farms, Inc. v. Commissioner, 61 T.C. 436, 440 (1974), affd. without published opinion 510 F.2d 970 (3d Cir. 1975)).  Thus, we have jurisdiction to determine whether petitioners are entitled to a bad debt deduction in 1990 and are entitled to a net operating loss carryback to 1989.

subordinated their purported loans to the loans of the corporation's regular creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; and (11) the ability of the corporation to obtain financing from outside sources at the time of the transfers.  See, e.g., Bauer v. Commissioner, 748 F.2d 1365, 1368 (9th Cir. 1984); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).  As among these factors "No one factor is controlling or decisive, and the court must look to the particular circumstances of each case", for "The object of the inquiry is not to count factors, but to evaluate them."  Bauer v. Commissioner, supra at 1368 (quoting Tyler v. Tomlinson, 414 F.2d 844, 848 (5th Cir. 1969)).[6]

---

[6]    As we stated in Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493-494 (1980):

> The identified factors are not equally significant, * * * nor is any single factor determinative.  Moreover, due to the myriad factual circumstances under which debt-equity questions can arise, all of the factors are not relevant to each case.  The "real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice." * * * "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." * * * As expressed by this Court, the ultimate question is "Was there a genuine intention to create a debt, with a reasonable expectation

(continued...)

Moreover, transfers to closely held corporations by controlling shareholders are subject to heightened scrutiny. Labels attached to such transfers by the controlling shareholders through bookkeeping entries or testimony have limited significance unless these labels are supported by objective evidence. See Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968); Goodrich v. Commissioner, T.C. Memo. 1997-194. "Courts will not tolerate the use of mere formalisms solely to alter tax liabilities." Hardman v. United States, 827 F.2d 1409, 1411 (9th Cir. 1987) (quoting Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945)).

After careful consideration of the facts and circumstances surrounding petitioners' advances to HPD and utilizing some of the factors noted above in addition to others, we conclude that the advances are capital contributions, not loans.

First, petitioners advanced money to HPD, their wholly owned C corporation, without intent that such advances be treated as debt rather than equity. Not engaged in the business of lending money, petitioners made the advances simply because the corporation needed the cash to survive. According to petitioner, the advances were made in order to "salvage" petitioners' investment because capital

_____

[6](...continued)
        of repayment, and did that intention comport
        with the economic reality of creating a
        debtor-creditor relationship?" [Citations
        omitted.]

and funds they had previously advanced to the corporation were in peril.

Second, petitioners have not shown that HPD could have obtained financing from an outside lender. That HPD had to look to petitioners in order to survive is evidence that the advances were capital contributions and not loans. HPD's financial situation grew worse, and yet petitioners continued to advance funds. HPD did not seek funds elsewhere. The only apparent means of obtaining financing for HPD was that utilized herein. We conclude that an independent commercial lender would not have lent funds to HPD under these circumstances.

Third, the documentary evidence regarding the purported loans is sparse. Other than the $310,000 promissory note[7] referenced in the October 15, 1987, board of directors meeting minutes, HPD did not execute any notes, or issue to petitioners any negotiable instruments, evidencing an obligation to repay amounts petitioners advanced to the corporation. The absence of notes or other

_____

[7] Petitioner testified that in addition to the $310,000 note in evidence, all other advances petitioners made to HPD were memorialized in promissory notes; however, petitioners failed to offer them into evidence. In such situations, we have noted:

> The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. [Citations omitted.] This is especially true where, as here, the party failing to produce the evidence has the burden of proof * * *

Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

instruments favors respondent.  See <u>Calumet Ind. v. Commissioner</u>, 95 T.C. 257, 274 (1990).

Fourth, no terms were provided for repayment, and the sole promissory note in evidence does not provide for an interest rate or interest payments.  HPD made repayments depending upon its cash position and liquidity; however, the repayments never kept up with the advances.  "If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution."  <u>Roth Steel Tube Co. v. Commissioner</u>, 800 F.2d 625, 631 (6th Cir. 1986), affg. T.C. Memo. 1985-58.  Moreover, petitioner testified that he would not enforce repayment of the advances, but instead HPD only had to repay the advances when it could.  Petitioners' failure to demand repayment and their continued lending of additional funds tend to refute the existence of a valid debtor-creditor relationship. See, e.g., <u>Boatner v. Commissioner</u>, T.C. Memo. 1997-379, affd. without published opinion 164 F.3d 629 (9th Cir. 1998).

Petitioners seek to find comfort in the fact that a portion of their advances was recorded as loans on the corporation's books and records.  However, we are not convinced that this fact entitled petitioners to enforce payment of principal or interest.  Rather, we believe the recordation was merely a bookkeeping entry of little value without the support of other objective criteria.  See <u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. at 495.

Finally, petitioners admit that HPD did not give any security

or execute any security agreements to collaterize the advances. According to petitioners, security for the alleged loans was "not needed especially when petitioners are the sole owners and the CEO of HPD with full control of its finances".

In sum, on the basis of the facts and circumstances, we conclude that petitioners did not intend to create bona fide loans at the time the advances were made. Rather, in an attempt to salvage HPD (as petitioner admitted at trial), petitioners advanced funds to the corporation when necessary, so far as the evidence shows, without the intention of being creditors. We hold that the advances were capital contributions. Consequently, petitioners are not entitled to a bad debt deduction pursuant to section 166. In view of this holding, we need not decide (a) whether the advances were business or nonbusiness bad debts and/or (b) whether the advances became worthless in 1990.

## Issue 4. Section 6662(a) Accuracy-Related Penalty

The final issue is whether petitioners are liable for the section 6662(a) accuracy-related penalty. Section 6662 imposes an accuracy-related penalty equal to 20 percent of any portion of an understatement attributable to negligence or disregard of rules or regulations or substantial understatement of tax. "Negligence" means any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and "disregard" means any careless, reckless, or intentional disregard. Sec. 6662(c). Additionally, no penalty is imposed with respect to any portion of

an understatement as to which the taxpayer acted with reasonable cause and in good faith. See sec. 6664(c)(1).

Petitioners failed to establish that they were not negligent. In claiming the deductions at issue, they failed to follow the rules and regulations either because they failed to determine what the rules require, or they acted in disregard of them. Petitioners, through HPD-Latigo, improperly attempted to use a profit participation fee in order to decrease their tax liability. Petitioners also failed to maintain adequate records or otherwise substantiate the alleged travel and automobile deductions. Finally, petitioners failed to offer any evidence that they should not be subject to the accuracy-related penalty. Accordingly, we hold that petitioners are liable for the section 6662(a) accuracy-related penalty.

In reaching our conclusions herein, we have considered all arguments presented and, to the extent not discussed above, find them to be irrelevant or without merit. To reflect the foregoing,

Decision will be
entered for respondent.